W. J. WARD ET AL., APPELLANTS, VS. GEORGE W. SPIVEY, APPELLEE.

S. with his family residing on public lands for eight years and having made valuable improvements applied to W. for a loan of $40 to enable him to enter the land. W. loans him the money, but S. not finding the land agent passes the money back to W. and requests him to make the purchase for S., and to hold the deed till the money was paid. W. enters the land in his own name and informs S. that "it is all right." S. continues to reside and make improvements on the land for five years longer until it is worth $2,500, when W. conveys the legal title to D. & M. for $700. The latter knowing of the long possession of S., and of his valuable improvements, and being further informed that S. claimed to own the property subject to the payment of the money due to W., *Held:*

1. That by the transaction between S. and W. the latter became the creditor of S., and held the land as trustee of a resulting trust in favor of S., and as security for the money advanced and interest.

2. That D. & M. having purchased with full knowledge of the settlement, occupancy and improvements by S., and that he claimed the property subject to the payment of the money advanced by W., are chargeable with notice of the trust, and their purchase gave them the same standing as that of W. in respect of the trust.

3. On bill filed against W., D. & M. by S. to redeem, he is entitled to a decree that D. & M. convey to him on payment of the $40 and lawful interest.

Appeal from the Circuit Court for Sumter county.

Spivey filed his bill against Ward, Dozier and Morrisette,

alleging that in 1866 he took possession of forty acres of land then belonging to the Trustees of the Internal Improvement Fund, subject to pre-emption and sale, and with a view of ultimately purchasing it erected a dwelling-house thereon, cleared and fenced a part, cultivated and planted orange trees, and made other improvements, and continued to live upon it and occupy it as a home for himself and family until the present time. In 1875, fearing that some one might enter it, he applied to Ward, who was a relative, for a loan of money for the purpose of buying the land. Ward agreed to lend him the money provided the title papers should remain in his hands as security for the loan. Ward knew all the facts relative to the settlement, cultivation and occupancy by Spivey. Soon after Ward saw the agent of the Trustees and entered the land, paying forty dollars therefor, and had the title made to himself, the deed bearing date April 3d, 1875. Soon after that Ward informed him that the land had been entered for his benefit. Spivey did not then know that the entry had been made in Ward's name, and on speaking to Ward about it he said the deed was so taken as security for the money so loaned and advanced, and that he would execute to him a deed on payment of the money. Ward lived but a short distance away from the land, and knew of all the improvements made by Spivey, which were made both before and after the purchase, and Ward never made claim of ownership until June 12, 1880, when Ward conveyed the legal title to Dozier and Morrisette.

That the improvements made on the land by Spivey were worth $1,500; that June 14, 1880, he offered Ward the money he had expended in entering and securing the land and demanded a deed of the same, and Ward refused the money and declined to give a deed. Spivey offers now to pay to Ward, or to Dozier and Morrisette, if they

are entitled to it, whatever sum may be adjudged due him or them on account of the said advance.

The bill charges that Dozier and Morrisette had full knowledge of all complainant's claims and rights before the conveyance to them by Ward.

The bill prays that it be ascertained what is due on account of the advances and purchase by Ward for him, and that the defendants be required to accept the amount and to execute to him a conveyance, and for general relief.

The defendant (Ward) appeared but did not answer. Dozier and Morrisette admit knowledge of the complainant's occupancy of the land from 1866 to the time of purchase by Ward, and of his making improvements by erecting a house and otherwise. They deny any knowledge or information of the agreements between Ward and complainant in relation to the purchase and advances alleged, and say that it was without legal validity; that it appeared of record that Ward had the legal title, and that on June 12, 1880, Ward and his wife executed to them a deed of conveyance of the land, which was recorded June 14, 1880. They have no knowledge or information that Spivey, on June 14, 1880, offered to pay Ward the money he had paid out in securing the land, but they allege notice to complainant of the conveyance to them by the record thereof on the day of the alleged offer. They deny any knowledge of the alleged rights of complainant by reason of the agreement with Ward, or of any equities in complainant; "that they bought the land in good faith and for a valuable consideration, and paid $350 in cash and gave their note for the balance, and that Ward was considerably in debt and was compelled to sell his property to pay the same;" that Dozier offered, before the purchase by him and Morrisette, to lend the complainant money to buy the land if he desired to purchase the land, but complainant declined the

offer, and complainant was thereupon notified that Ward had offered it for sale and that he and Morrisette had an idea of buying, and yet the complainant did not notify him that he had any claim, right or equities thereto, or desired to purchase, and defendant knew of no right but possession.

There was a general replication and testimony was taken. Spivey testified that he had known Ward forty years, Dozier ten years and Morrisette one year; that he went on the land in 1867, and had remained there ever since, and improved it by clearing, building and planting an orange grove. The value of it is $3,000. "The way the entry came to be made, I borrowed from Mr. Ward to make the entry. I came here on Saturday, understood that Mr. Corley, the land agent, was to be here that day, and I brought my numbers intending to give Mr. Corley my numbers and money, and I remained here till late in the evening and he did not come in, and I asked Mr. Ward if he would see Mr. Corley when he went through and give him the numbers and money. Mr. Ward told me that he would do it, and he said to me about two weeks after, that the title has come, it is all right; and I says to him hold on to the title as security for the money until I pay you your money.

"Defendants, Dozier and Morrisette, had a conversation with me, I think in June, on Saturday evening, about the middle of the afternoon or later, at the south end of Mr. Turner's old store; that was the first conversation between me and Mr. Dozier. Mr. Dozier took me out from Mr. Turner's store, said he wanted to see me. Says he, I have been out to look at your place this evening. I asked what he went to look at my place for. He said Ward was trying to sell it to him, and that he would buy it if all parties was willing. And I says to him all parties is not willing.

And he says well, he is going to sell it to somebody, and had you not as lief I buy it as anybody else. Says I to Dozier anybody that knows how that place lies are not going to buy it; says I, he has carried out other parties there, and when they found out how it was they were gentlemen enough not to buy it. I don't recollect much more conversation between us at that time. After that awhile Mr. Dozier went to Mr. Morrisette and Mr. Gibbons, beside Mr. Chaplins, and they were talking there awhile; they then came back to me near Mr. Turner's front porch. I told them then that Mr. Ward had no right to sell the place, the place was mine. Well, Mr. Dozier says, Mr. Ward has a title for it, and I think I will buy it, and I asked him as a Mason not to have anything to do with it. I heard a conversation between Mr. Mabry, Dozier and Morrisette early on Monday morning. I went down to Mr. Mabry's before day, and Mr. Mabry came up very early. We met Mr. Morrisette on the side-walk in Leesburg. Mr. Mabry told him not to pay anything on the place, that I claimed the place. We went to Mr. Dozier's place, called Mr. Dozier out, and Mr. Mabry told him not to pay anything on the place as I claimed the place. When I took possession the lands were worth one dollar per acre. I took possession of it as State land, with the intention of buying it. Since April 3, 1875, I have reset half the grove and cleared six or seven acres; the value of these improvements is about one thousand dollars. In 1877 I offered Ward a young horse; I told him to give me twenty-five dollars and a deed to the place; he declined; he said I was not able to do so and support my family, and he could wait longer. He never demanded payment from me."

J. S. Dyches testified: I heard conversation between Spivey and Ward before the entry of the land. Mr. Spivey

came to Mr. Ward to borrow money to enter the land, as he, Spivey, thought at the time there were other parties who wanted to enter it. Mr. Ward told him he would enter the land for his benefit, and hold the papers until Spivey was able to redeem with interest. It was agreed between them that Ward should do so. Ward has resided within half a mile of the land so entered for the past three years. Mr. Dozier has resided in and about Leesburg since 1866. The value of the improvements on the land on the 12th of June, 1880, was $2,500 to $3,000. I heard a conversation between Ward, Dozier and Morrisette in reference to Ward's surrendering the property he had received from them in payment for the land. I was called on by Mr. Ward to witness the tender. There was some trouble in regard to the payments to be made by Dozier and Morrisette. They wanted to withhold a part of the payment until the trouble between all the parties was settled. Ward refused to have any withheld, and told them he would pay back the amount he had received from them if they would cancel the deed. Mr. Spivey, Mr. Ward and myself have talked this matter over and over. Mr. Ward always acknowledged that Spivey was entitled to redeem the land by paying him the entering fee and interest.

Martha E. Spivey testified that she is the wife of George W. Spivey ; lived about three miles southeast of Leesburg for fourteen years. "There was no improvements on the land when we first went upon it. There are now buildings on it, an orange grove, and twelve or fifteen acres cleared. At the time of the entry of the land Mr. Ward proposed to furnish the money and hold the title until the money was paid by Spivey. Spivey was to meet Mr. Corley in Leesburg, and Ward was to let Spivey have the money that day. Mr. Spivey was at that time destitute of means. I had a conversation with Mr. Dozier in regard to himself

and Morrisette purchasing the land from Ward. Dozier said he had come to buy the place if it was agreeable. I told him we did not want to sell; we wanted it for our home. I told him the agreement between Mr. Ward and Mr. Spivey was that Mr. Spivey was to have the entry money and the interest that was due him. Mr. Dozier then said to Mr. Ward that he ought to make me or Mr. Spivey a title. When Mr. Dozier went away he told me I need not be uneasy as he would not buy the place. I told him if he did we would not give him possession. This conversation took place about twelve or one o'clock on the Saturday on which he bought the place at night in the month of June, 1880. Mr. George Ward, W. J. Ward and Mr. Morrisette were present. I asked Mr. W. J. Ward why he brought Mr. Dozier and Mr. Morrisette here. He said they came over to look at this land. I told him I did not want him to bring any more men for that purpose; it looked as if he did not want to come up to his agreement. He said I did not need be uneasy, that he was not going to let Mr. Dozier have the place. I told Mr. Dozier of the agreement between Mr. Ward and Mr. Spivey before the land was entered. Mr. Dozier said he would like to buy the place provided Mr. Spivey and I were willing. He said he would not want the place if it were not for the orange grove."

John W. Thomas testified: I heard Mr. Spivey tell Mr. Dozier not to buy the land unless he bought it from him. Mr. Dozier said he might as well buy it as anybody, as Mr. Ward would sell it to somebody. This was about three P. M. on Saturday, 12th of June, 1880, at the south side of Turner's old store.

J. W. Lees testified: I am the deputy clerk who took the acknowledgment of a conveyance from Ward and his wife to Dozier and Morrisette. The acknowledgment was

taken on the 12th of June from fifteen to thirty minutes after eleven o'clock P. M. at the residence of W. J. Ward, three or four miles from Leesburg. I went at the instance of Mr. Dozier.

Mr. Cureton testified: I heard a conversation between Mr. Spivey and Mr. Dozier at the east side of Turner's old store, between three and four o'clock P. M., on Saturday. Mr. Spivey said to Mr. Dozier, you nor no other man can get that place until I am satisfied. I was present on the place where G. W. Spivey resided. Mr. Dozier and Mr. Morrisette were there. It was the Sunday evening after they said they had bought the night before. Mr. Spivey says: Mat, I suppose you have bought the place. Mr. Dozier said: I have. Spivey said: I asked you yesterday, as a Mason, not to buy this place, and you promised me you would not. Mr. Dozier said: I was wide awake when I bought this place; I was not asleep.

W. M. Goodson testified: I had a conversation with Dozier and Morrisette in June, 1880. Dozier asked me what I knew about the titles, and I told him that they were in W. J. Ward's name. Dozier said Ward had bantered him to sell it to him and he was going out to look at it; but don't know whether I will buy it unless it is satisfactory to Mr. and Mrs. Spivey. He asked me if I did not think Mr. Spivey ought to have something for the improvements. Had a second conversation with Mr. Dozier on Sunday morning on the Spivey place. He called me one side and told me: I have bought this place, and have not paid the purchase-money. He says: I am sorry for Mr. Spivey, and do not think he ought to lose the improvements; and he wanted him to have pay for them, and wanted me to speak to him and tell Spivey if he would meet him at Leesburg on the next morning he could have him garnisheed and stop the payment. On Saturday night, between 9 and

10 o'clock, Dozier and Morrisette called at my house, and Dozier said he had bought the place and was going to draw up the writings.

M. W. Dozier, one of the defendants, testified : Ward had been trying to sell me that place two or three months. After examining the records I found it was his land. I saw Mr. Spivey and told him Ward wanted to sell me the place he lived on, and wanted to know if it was all right. He answered me that it was not. I asked him why, and he answered me that that was his business. I asked him if he knew that the title was in Ward's name. He said he did. I asked him what claim he had on it. He said he had done the work that was on it. *I asked him if he owed Ward anything on the place. He said he did.* I asked him why he did not pay it and take a deed. He said he did not have the money. I told him I would lend him the money provided he would pay me interest like I would have to pay if I borrowed. He said he would not do it. I told him if he did not settle that evening I should buy it. We closed the trade that evening with Ward for seven hundred dollars, half cash and half payable in January. We agreed to draw up the deed that evening as Ward wanted to go to Hernando very early Monday morning. He gave us the deed and we paid him early Monday morning. Next morning (Sunday) we went over to the place. I told Mr. Goodson that we had bought the Spivey place, and *asked him if he thought Spivey knew it,* and told him he could tell him of it if he wanted to. Directly Spivey and Goodson came up. Spivey said I suppose you have bought it. I told him yes. He swore and was very mad. I told him I thought he could get pay for his labor; I told him he might save seven hundred dollars, if there was that much due him, if he would be at Leesburg very early on Monday morning. He said he did not want seven hundred dollars

for that place; that he would not take less than a thousand. The seven hundred dollars I meant that we had not paid Ward, nor would until Monday morning; and that he garnishee us. He came down Sunday night, and he asked me to detain the payment until he could get to Mr. Mabry. I did retain it after Ward had sent for it the next morning about one hour. I had agreed to pay Ward by day-break the next morning. A few minutes after I had paid it to Ward Mr. Mabry and Mr. Spivey came to my gate and told me not to pay it. I told them they were too late, I had paid part of it. My information I had in reference to Spivey's interest in the land was from rumor and the fact that Spivey lived on the place, and did not think any sensible man would live on another man's land, for which he had no showing, the length of time he had. I had no direct information that Spivey had any interest in the land. I saw him move on the place in the year 1868; he has resided on the place since he moved there. The trade was closed sometime between one and four o'clock in the evening after I had the conversation with Mr. Spivey. The deed was signed sometime before midnight Saturday night, and I made the first payment sometime between day-break and one hour by sun on the next Monday morning. The first payment consisted of a horse, a mare and a buggy. A few days after I paid fifty dollars. This is all I paid on said land except an account of forty-one dollars, which Ward agreed to allow on settlement; besides, I have obligated to pay for Ward's attorney's fees in this case one hundred dollars. I delivered the personal property mentioned in the first payment to Ward's son-in-law and Ward's wife on Ward's verbal order. When Mr. Mabry notified me that the land was Spivey's I had already told Curry, the son-in-law, and Mrs. Ward where the harness and buggy were, and they could get them whenever they got ready. I considered it a

delivery of the property.    When I received the information from Mr. Mabry I do not know whether the property had been taken from my premises or not.    I did not go to see nor make any effort to prevent them from taking it.    I recollect hearing Ward tell Spivey's wife that *if George would pay him his money he would make him a deed ;* that was the day I went to look at the place and before I made the purchase.    I think that Ward told me that Spivey got him to enter this land provided Spivey would pay him the money.    When Ward was keeping bar-room here he told me that Spivey came to him to get him to enter the land in his (Ward's) name and hold it some three or four years, and if Spivey paid him the money he was to make Spivey a deed, else if he did not pay he said to him, if I don't pay you the land is yours. Ward told me that he told Spivey that he would not do it, and the next time Spivey came to town and brought his wife.    She got after him, he was sorry for them, and entered the land at her request so they could have a home, and he had to feed them ever since.    When I went to buy the land from Ward he told me he *couldn't get his money out of him*, and that he had let him live on his land so long they thought they owned it, and that the old scoundrel tried to swindle him out of his cattle, and he was not going to wait any longer, and he told Spivey's wife that if they would pay him his money he would make them a deed.    The reason the deed was made about midnight on Saturday night was that Ward wanted to go to Hernando early Monday morning.

George P. Lovell testified in relation to lending money to Ward four or five years before and taking a mortgage from him on this land.    Does not know that Spivey knew of it.    Ward said something about Spivey entering the land, or he had entered it himself, but the land was intended for Spivey.

James G. Gibbons testified that he was present at conversation on the Saturday in question near Turner's store between Dozier and Spivey, Morrisette and others being present. Dozier told Spivey he would buy the land from Ward if Ward would stick to his proposition. Spivey made some threats against Ward if he should sell the place. Dozier asked him why he did not pay Ward and take the deed himself. Spivey said he did not have the money. Dozier offered to let him have the money by paying interest if Spivey would give him a mortgage. Spivey would not do it. Ward then came up, and Spivey went away. Understood in the conversation that Spivey told Dozier that if he bought the place from Ward it would do him no good, as it was his own, and that he would shoot or kill the man that attempted to put him off.

J. B. Morrisette testified to various conversations with Spivey and Ward. The first he heard about Spivey claiming the land was through his wife the day we went out to look at the land on the Saturday we purchased. She said they had done a great deal of hard work on there, and it was wrong in Mr. Ward to sell the place from under them. Heard Spivey say in Leesburg that afternoon that he had improved the land and did not intend to be driven off from it. That whoever bought the land it would not do those persons any good. *Dozier offered to loan him the money to secure the land* if Spivey would secure him for his money. Spivey did not seem inclined to do it. Spivey said that he knew that he could not hold the land by law, and that he would be taken to Lone Oak grave-yard before he would be moved off the place. He (Spivey) said that he went to Ward and told him that there had been two or three parties out there to look at the land, and that he was afraid they would enter him out, and that he would rather he (Ward) would have it than anybody else. He (Spivey)

said, I think, that if he should pay Mr. Ward in a certain time *what he owed him* (don't remember the time) that he (Spivey) was to have the land; that Ward was to make him a deed. Spivey said that Ward entered the land with that understanding. Don't remember that Spivey said the time nor the amount that he was to pay Ward. He (Spivey) said that the time had expired, and he knew he could not hold it by law. He (Spivey) made no *leyal* claim to the land at that time. Witness had a conversation with Ward before the purchase of the property from Ward, in which Ward said Spivey told him there were parties prospecting in his neighborhood, and that he wanted Ward to enter the land as he was owing him, and if he never paid him he (Ward) have the land. He (Ward) entered it with that understanding. Thinks that Ward said that if Spivey paid him he would have the land. I was satisfied from what Mr. Dozier told me as to the record, and from what Mr. Ward told me, that the title was good, had no notice of any *legal* claim on the land except that of Ward, nor of anybody else having any interest. All the payments that were made on the land were made by Mr. Dozier. I settled with Mr. Dozier about a week after, and after a conversation between Mr. Mabry and myself. This conversation was an hour or two after Mrs. Ward and Dan Curry took the property out of Dozier's stable and premises. The conversation was about nine or nine and a half o'clock in the morning. I mean, when I said in my examination that I had no notice of any legal claim except what Ward held, to except also what I heard from Mrs. Spivey and Mr. Spivey in previous conversation, which I have related.

Mrs. C. A. Smith testified: I heard Mr. Spivey tell my husband that the title to the land was in Mr. Ward's name, and he was liable to sell at any time.

*Question*—Did you ever hear Mr. Spivey say that Mr.

Ward had a right to sell the land, and could do so if he chose?

*Answer*—I heard Mrs. Spivey say so; never heard Mr. Spivey say so. He was not present when she said so. This was about two years ago.

M. H. Mabry testified: I went to the house of defendant, Ward, on the 14th of June, 1880, before 12 o'clock; told Ward that as attorney and agent for Mr. Spivey I had come to pay him the money and interest on it which he had advanced to Mr. Spivey in entering the land on which Mr. Spivey lived. I told him I had $75 legal tender currency which I desired him to accept for Mr. Spivey. Mr. Ward said my tender was too late, he had sold the land to other parties. He said he did not think it was right to do it then. I told him Mr. Spivey wanted him to make a deed of the land to him, and he said he could not do so at that time, because he had sold it to other parties. Early in the morning on the 14th of June, 1880, in company with Mr. Spivey, I went to the defendant, Morrisette, and told him, as Spivey's attorney, not to pay anything to Ward on the land he and Dozier were proposing to buy, or had bought from Ward, as the land was Mr. Spivey's. We then went to Mr. Dozier, and I notified him not to pay any money on the land, as the place belonged to Spivey. It was very early in the morning that we saw Morrisette and Dozier, the sun was less than an hour high. About an hour and a half after we saw them, and so notified them, I saw Mrs. Ward and Dan Curry go to Mr. Dozier's stable and get some harness and a buggy, with one horse to the buggy, and go out of town. The tender of the money to Mr. Ward was not coupled with any condition but unconditional.

J. S. Dyches testified: I was in Leesburg early Monday morning following the sale, and saw Mr. Mabry and Spivey

go to the Mr. Dozier's gate and call him out. Mrs. Ward and Dan Curry had not arrived in Leesburg at that time. I saw them come in afterward. I saw Mrs. Ward and Dan Curry leaving Dozier's and going out of town two hours after I saw Mabry and Spivey go to Dozier's. Just before that I saw them with Mr. Morrisette. This was a long time before Mrs. Ward and Curry came into town. I saw Mr. Mabry tender Mr. Ward a lot of money, the amount was $76. As stated by Mr. Mabry, it included enough to pay him for the entry fee of the land with interest from the date of entry and a little over, but that he tendered him the whole of it. Mr. Mabry said : Ward, here is your money for that land, now make a title of that land to Mr. Spivey. I am not certain as to the precise words of Mr. Mabry. Mr. Mabry in making the tender did not request, demand or exact a deed from Mr. Ward to Mr. Spivey or any one else to the land, as a condition precedent upon the payment to Ward of the money. Mr. Mabry said : Here is your money, now make Mr. Spivey a title to the land. Mr. Ward objected, saying he had sold it.

This is the substance of all the testimony. The court decreed that upon the payment or tender of payment by complainant, or any one by his authority, of the sum of forty dollars with interest thereon from the third day of April, 1875, at the rate of eight per cent., to Dozier or Morrisette, that they convey to G. W. Spivey the NW. $\frac{1}{4}$ of NE. $\frac{1}{4}$, Sec. 32, T. 19, R. 24, S. and E., being the land in controversy, with the appurtenances, and further that W. J. Ward, M. W. Dozier and J. B. Morrisette be enjoined from interfering with or intermeddling with G. W. Spivey in the peaceful occupancy of such premises upon such tender or payment as aforesaid being made, and that the defendants pay the costs of this suit. From this decree defendants appealed. It is prayed that the decree be reversed :

1. Because the court held that Ward held the land in trust for Spivey.

2. In holding that Dozier and Morrisette were not innocent purchasers without notice.

3. In holding that they were in no better position than Ward, and that they were not entitled to hold the land upon payment or tender of the money mentioned.

4. In decreeing that they should convey to Spivey upon such tender or payment.

5. In decreeing an injunction.

*J. H. Goss* for Appellants.

*Hocker & Mabry* for Appellees.

THE CHIEF-JUSTICE delivered the opinion of the court.

Argument upon this case is hardly necessary to sustain this decree.

Spivey was a squatter on public land, and having made improvements of value and established his home there, fearing to be " entered out " he applied to his relative (Ward) for a loan of $40 to pay for his forty acres and secure the results of the labor of himself and wife for eight or nine years. Ward lent him the money, but the Agent of the Internal Improvement Fund lands not coming as expected Spivey hands the money back to Ward with a memorandum of the " numbers " and a request that Ward pay the money for the land for Spivey and hold the title deed until Spivey should pay him. A few days after Ward informs Spivey that " that the deed has come, it is all right," and Spivey said to him hold on to the title as security until I pay you your money. When Ward lent Spivey the forty dollars he became Spivey's creditor, and Ward paid for the land with the money borrowed from him by Spivey. Six years more pass until the home of

Spivey becomes worth $2,500 or more. Ward once mean-time, in 1877, declined to take his pay in property, saying Spivey was not able to part with the property offered and support his family, and he (Ward) could wait longer. Ward never demanded payment so far as appears here.

In 1880 Dozier and Morrisette wanted Spivey's orange grove, and Ward wanting more money than the $40 and interest, they bought it from Ward for $700. They knew that Spivey and wife had lived upon and cultivated the place as though it was their own. Dozier, who is the ne-gotiator for himself and Morrisette, has known it near fourteen years, Morrisette for one year, and they knew its value. Denying their purposes to Spivey and his wife after looking at the place, and being told by Mrs. Spivey and by others, including Ward himself, that the land had been purchased for the occupants, and by Spivey and his wife that it was their own, and that they would not permit Ward to sell them out and dispossess them, they proceed on the same day, Saturday, at midnight, to have a deed made and acknowledged, (Dozier requesting the offi-cer to go to take the acknowledgment,) and to deliver the purchase price on Monday morning before most people were out of their beds, and before Spivey could, by ordi-nary diligence, obtain the aid of counsel to save his home and the fruits of his and his wife's fourteen years of labor. The pretext that this midnight haste was on account of Ward's desire to leave that part of the country early Mon-day morning is a very thin disguise, and it is evident that they were no less anxious to have him get out of the way than he was to go. It is very apparent from the testimony of disinterested witnesses that Dozier was notified by Spi-vey's counsel of the true state of affairs on that Monday morning, before the delivery of the property, which was the " first payment," and he says himself that he " made

no effort to prevent them (Ward's wife and son-in-law) from taking the property away." Dozier was then a purchaser with notice of the trust given at that moment, and, disregarding it, he takes the land charged with the trust even though the conveyance was actually executed. See Tiffany & Bullard on Trusts and Trustees, 199 n. 1, and authorities cited.

Dozier and Morrisette, however, had notice of the long possession and residence of Spivey on the premises. This was sufficient to put them on their guard and to full inquiry into Spivey's legal and equitable claims. (17 Fla., 886.) They were both notified by Spivey and his wife before they closed the bargain that the property was in their possession under claim of interest and ownership, and that Spivey had only to pay what he owed Ward to entitle him to a deed. They knew it from Ward, for they both heard it addressed to them on the very day the deed was executed and before it was written.

Dozier knew of Spivey's interest as he himself shows by offering him the money to pay up *Ward's claim for the money due him on the land*, and Morrisette testifies to this offer also.

The fact that Spivey said he had no *legal* title, and thought Ward could sell him out, can have no bearing upon the case. He may have been as some laymen are, ignorant of equitable rights and remedies. Dozier and Morrisette both relied upon the record as showing the legal title in Ward, and rested upon that even after being notified that Spivey claimed property in the land, thus showing that they were equally ignorant that his equitable rights might be recognized by the courts. They " thought Spivey ought to have something ;" and Dozier tried to entrap him into a recognition of Ward's right to convey by endeavoring to get him to garnish the purchasers as for a claim

against Ward. We have no doubt from the evidence that both Dozier and Morrisette were fully informed of the relations of Spivey and Ward, growing out of the entry of the land in Ward's name, and that they were ignorant only of Spivey's equitable remedy.

The result of the whole facts is, that Ward from the time of the purchase was a creditor of Spivey for the amount loaned and advanced, and purchased the land for Spivey and at his request. He then became a trustee of a resulting trust, holding the legal title in trust for Spivey and as a security for the money advanced for him. (Story's Eq. Jur., §1201; 2 Black., U. S., 613; Tiff. & Bullard, 31.) Dozier and Morrisette had ample notice to charge them with the same trust, and they hold the legal title, as did Ward in trust for Spivey, and only as a security for the same money owed by him to Ward. Spivey has the same right to redeem from them that he had to redeem from Ward. He has also the same standing in equity to compel them to give him a title that he had as against Ward. Spivey's position has not been changed. He will be entitled to a conveyance from the holders of the legal title on paying or tendering to them the amount due by his agreement with Ward.

The principles governing cases of this character are more fully discussed in Mathews vs. Porter, 16 Fla., 466 ; Lindsay vs. Mathews, 17 Fla., 575 ; McRae vs. McMinn, ib., 876 ; Runnels vs. Jackson, 1 How. Miss., 358; Boyd vs. McLean, 1 Johns. Ch., 582 ; Tiffany & Bullard on Trusts and Trustees, 31, 197.

A tender was made to Ward, who said he had sold and it was too late. We are not satisfied by the evidence that the deed had been then delivered or any part of the consideration paid, but we are satisfied that it was not too late when Dozier and Morrisette were notified by the complainant and

55

his attorney for them to have prevented the delivery of the property which constituted "the first payment." Their conduct throughout the entire transaction savors very strongly of an effort to obtain the property of Spivey, worth $2,000, for a mere pittance, and according to Dozier's testimony, Ward is paying their counsel out of the $700 to defend them in carrying out this questionable enterprise.

The decree of the Chancellor is affirmed in all respects.