### NOAH C. ROGERS

#### v.

### HELEN FOUNTAIN GENUNG et al.

[Decided November 13th, 1908.]

A real estate agent, who had land for sale, was asked by complainant to carry specific offers to the owners who had employed him to sell it. He had no discretionary authority, and received no commission from complainant. Upon refusal of the last offer, without waiting to ascertain if complainant wished to make further offers, the agent sold the land to his own wife, who had knowledge of her husband's relations with complainant; she paying for it with her own money.—*Held*, that there was no such fiduciary relation between complainant and the agent as would make the agent's wife a constructive trustee.

On bill, &c.

*Mr. Alfred Mills* and *Mr. William H. Corbin,* for the complainant.

*Mr. Charles A. Rathbun* and *Mr. Richard V. Lindabury,* for the defendants.

STEVENS, V. C.

This is a suit to compel the defendant Helen Genung, to convey a tract of land near Morristown to the complainant.

The facts are very simple. Noah C. Rogers, a New York lawyer, residing in Morristown, on May 14th, 1907, wrote to Mr. Genung, a real estate agent and husband of Helen Genung, as follows:

"I would be glad if sometime at your convenience you would give me a list of small places that you have for sale, with prices, near Madison, Convent or Morristown stations, either with or without farm buildings— say within a mile or two of stations."

To this, on May 17th, Genung responded:

"I beg to offer you below a list of a few places that may be of interest to you   *   *   *   The Conkling farm this side is on both sides of the road   *   *   *   there are 15 acres   *   *   *   offered at $8,000."

On May 29th, Mr. Rogers replied:

"I have your list of places. If you are not otherwise engaged I should be glad to talk with you about these places to-morrow afternoon at my house   *   *   *   I am inclined to think that the Murphy and Conkling tracts would be the most likely to be of interest and would be glad if you would ascertain the lowest prices and also how much could remain on mortgage, and at what rate of interest."

On Thursday, May 30th, there was an interview. Mr. Rogers told Mr. Genung that he wanted to buy the Murphy and Conkling tracts as a plot, they being adjoining parcels. Genung advised him to offer $7,000 for the Conkling plot and $13,000 for the Murphy, telling him that offers of $6,000 and $6,500 for the Conkling tract had been refused. Rogers authorized these

offers to be made. They were made and declined. Shortly after, Rogers, through Genung, took a deed for the Murphy tract at $15,000. The negotiations about and the conveyance of this latter tract have no bearing upon the matter in hand.

On Tuesday, June 4th, Genung informed Rogers that he could probably get the Conkling property for $7,000 if he would allow one of the owners, Mr. Conkling, to remain on it for his life. Rogers replied that it was more desirable to have possession and he requested Genung to find out if by paying a higher price he could get immediate possession. He authorized Genung either on the evening of that or the following day to increase the price to $7,250, to $7,500 and, if necessary, to $8,000, if Conkling would give up his life possession.

On Thursday, June 6th, Genung and his wife went to the Conkling house. Genung made the offer of $8,000, which was refused. Then either Mr. Genung, for his wife, or Mrs. Genung herself made an offer of $7,000, with the life right, which was accepted. Upon the acceptance, Genung filled up a blank form of agreement, which he had brought with him, and it was there executed. On the same evening Rogers called upon Genung and was told by him that he had visited the premises with his wife and that the Conkling family had decided that they wouldn't sell except subject to the life lease. He did not tell him that his wife had purchased. Rogers then said:

"Very likely I will take it. Anyhow, I will telephone you, but very likely I will take it, but I would very much rather give a higher price and eliminate the life lease * * * I will let you know to-morrow whether I will take it with the life lease or not. I will communicate with you from New York."

Next morning Genung sent his attorney to the Conklings to have them acknowledge the agreement, so that it might be recorded and immediately after its acknowledgment, sent to Mr. Rogers at his New York office a registered letter in which he said:

"As your client seems to have hesitated with this life right in view and as the other party who started the negotiations for the place, as I told you some days ago, was willing to buy the property with this life right, I have closed a contract with the other party."

In an interview had that same evening with Rogers, Genung, on being pressed, admitted that the "other party" was his wife and that she had bought it as a speculation. The reason for this sudden purchase would seem to have been that Genung had, from what Rogers had either said or refused to say, begun strongly to suspect that he was really buying the property for Mr. Jenkins, who, or whose wife and nephew had been purchasing large tracts of land in the surrounding neighborhood.

On this state of fact the court is asked to declare that Mrs. Genung is constructively a trustee for Mr. Rogers and bound to convey to him on payment of the price.

The evidence is uncontradicted that it was the money of Mrs. Genung and not of Mr. Genung that went into this purchase. As it is conceded that Mrs. Genung was informed by her husband of all the steps taken in the Rogers negotiations, it is argued that Mrs. Genung occupies no higher ground than Mr. Genung, and that the case must be dealt with just as if he had acquired the title. Without expressing any opinion on this proposition, I will, for present purposes, assume that it is sound.

It is an undisputed fact that Rogers was not to pay a commission to Genung; that Genung's compensation was to come wholly from the vendors. Notwithstanding this, it is contended that Genung was Rogers' agent and that as such he was incapacitated from acquiring any advantage for himself or his wife.

While counsel do not agree whether Genung was Rogers' agent they cannot disagree about what Genung was employed or requested to do. He was to carry specific offers from Rogers to the vendors. This was all he was to do. He had no discretionary authority. This being so, I am at a loss to perceive how Genung's position was at all different from that of any other real estate agent, who, trying to sell a property that has been placed in his hands by its owner, receives offers for it which he communicates to that owner. Rogers does, indeed, say that in the course of the negotiation Genung asked him if he thought he had the right to represent anybody else, and that he replied: "Decidedly, no; while you are representing me confidentially and submitting my offers, I don't consider you have a right to represent anybody else or to go into it with anybody else." To

this Genung made no response. "He said nothing more, but dropped the subject." But it seems to me that Mr. Rogers must have said this without due consideration. Genung's first duty was toward his employers—the vendors, who had put the property into his hands for sale; the vendors to whom he was bound to submit offers; not from one person only, but from all from whom he could obtain offers. On Rogers' own testimony there was, as the result of the inquiry, no promise on Genung's part to do what would have been contrary to his duty.

Genung was, indeed, in conversation on the evening of the day on which his wife agreed to purchase, guilty of a concealment that might perhaps, from an ethical standpoint, be open to criticism; but if he failed in any duty imposed by law, it was in one that he owed the vendors, who are not here complaining. He did not give *them* the information about Mr. Jenkins that, as it appears to have influenced him, might also have influenced them, and he did not, as he ought to have done, tell them that Rogers had made no final offer; that he was evidently anxious to purchase—so anxious that he might be induced to pay more than his wife and concede the life right beside.

As far as Rogers is concerned, the case stands merely thus: Rogers said to Genung, make certain specified offers for me. This Genung did. He failed, however, to wait and see whether the last—the $8,000 one—being refused, Rogers would make another. Rogers had not said that he would or that he would not, but Genung might very reasonably have concluded that he would; especially if he thought that the Jenkins family were the real purchasers.

Now, as Rogers' money did not go into the purchase, there was, of course, no resulting trust, in the ordinary sense of the term. But it is said that a trust resulted from the *transaction,* if it did not from the *agreement.*

This distinction, as applied to the facts of the case, is unintelligible to me. In what did the "transaction," as distinct from the "agreement," consist? It consisted in Genung's submitting to the vendors three or four offers—all declined. If beyond and in addition to the "transaction" there was anything else, it was at best, nothing more than an implied undertaking

2

on Genung's part that he would continue to submit Rogers' offers as long as Rogers continued to make them. Now, how did this "transaction" make Rogers a *cestui que trust* of the property and Genung a constructive trustee, when neither of them had, at any time during its continuance, any interest, either legal or equitable, in the property? And how could the implied undertaking, if there was any, have had any such effect? Could an undertaking to submit offers, based on no consideration moving from Rogers to Genung, be deemed in equity the equivalent of an undertaking on the part of a paid agent to obtain and convey property? In *1 Perry Trusts* § *135,* it is said:

"Parol proof cannot be received to establish a resulting trust in lands purchased by an agent and paid for by his own funds, no money of the principal being used for the payment, for the relation of principal and agent depends upon the agreement existing between them and the trust in such a case must arise from the agreement and not from the transaction, and where a trust arises from an agreement it is within the statute of frauds and must be in writing."

In *Wallace* v. *Brown, 10 N. J. Eq. (2 Stock.) 308,* Chancellor Williamson took the same view. He says "A employs B as his agent to purchase a house for him. B makes the purchase, takes a deed in his own name and pays his money for it. A cannot compel B to convey." To much the same effect are *Nestal* v. *Schmid, 29 N. J. Eq. (2 Stew.) 458,* and *Thalman* v. *Canon, 24 N. J. Eq. (9 C. E. Gr.) 127. Bartlett* v. *Pickersgill, 4 East Rep. 577,* is the authority upon which this view of the law rests. There, defendant bought an estate for plaintiff, but there was no written agreement between them, nor was any part of the purchase-money paid by plaintiff. Defendant articled for the estate in his own name and refused to convey to the plaintiff. There being no written evidence that the estate was purchased for the plaintiff, Lord-Keeper Henley held that the statute of frauds applied. This case was doubted by the lord-justices, in *Heard* v. *Pilley, L. R. 4 Ch. 548,* but followed by Justice Kekewich in the later case of *James* v. *Smith (1890), 1 Ch. Div. 384.* In the still later case of *Rochefoucauld* v. *Boustead (1897), 1 Ch. Div. 196,* Lord-Justice Lindley said that *Bartlett* v. *Pickersgill, supra,* could not be regarded as law

at the present day; that Justice Kekewich had overlooked the later cases, and that "it seemed to be inconsistent with all the authorities of this court, which proceed on the footing that it will not allow the statute of frauds to be made an instrument of fraud." The American cases are equally conflicting. They will be found collected in a note appended to the case of *Johnson* v. *Hayward, 5 L. R. A. (N. S.) 112.* In view of the utterances of this court, in the cases above referred to, it may be doubted whether I would be justified in following the more recent English rule, even if it were considered to be the better. But I do not have to pass upon the question, for all the cases require proof, at least, of a special trust and confidence and such proof is altogether lacking in the case at bar. Genung was not employed to purchase the property for Rogers. He was only employed or, to speak more accurately, requested to transmit certain specified offers to Genung's principal. To assert that a request of this character is equivalent to an employment to purchase is a mere perversion of language.

It is further argued that if the case is not one of constructive trust, based upon special confidence reposed and violated, the deceit perpetrated by Genung takes the case out of the statute. As I have already said, Genung's conduct, as far as it was questionable, if it injured anyone, injured the vendors, and they do not complain. Up to the time that his wife purchased he had made no misrepresentation to Rogers and had concealed nothing from him. He did, for twenty-four hours after the purchase, conceal it from Rogers, but this concealment did not induce Rogers to change his position, and it did not, in anywise, injure him. If Genung had told him on the evening of the day on which the agreement was signed that it had been signed by his wife, he would have stood in precisely the same position that he does now. It is, therefore, unnecessary to consider the question mooted in the case of *Starrett* v. *Boynton (Court of Errors and Appeals), 73 N. J. Eq. (3 Buch.) 669,* whether fraud will, under some circumstances, supply the place of a writing.

I think the bill should be dismissed.