PORTE F. QUINN, JENNIE E. WATSON AND JOHN C. GREGORY, *Appellants,* v. JOHN S. PHIPPS, *Appellee.*

Division B.

Opinion Filed April 11, 1927.

Petition for Rehearing Denied June 14, 1927.

1. The term "fiduciary or confidential relation," is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused —in which confidence has been reposed and betrayed. The origin of the confidence is immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies upon another.

2. If a relation of trust and confidence exists between the parties, that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused, that is sufficient as a predicate for relief.

3. The principal to a business transaction is bound by his words and deeds rather than by a concealed purpose in his mind on which he subsequently chooses to act to the detriment of one to whom he owes loyalty and good faith.

4. A constructive trust is one raised by equity in respect of property which has been acquired by fraud, or where though acquired originally without fraud, it is against equity that it should be retained by him who holds it.

5. Equity will raise a constructive trust and compel restoration where one through actual fraud, abuse of confidence reposed and accepted, or through other questionable means gains something for himself which in equity and good conscience he should not be permitted to hold.

6. Under such circumstances as are presented in this case it is essential that a confidential relation be established before constructive trust will be raised; but it is not essential that such confidential relation be predicated on that of husband and wife, parent and child, guardian and ward, attorney and client, principal and agent, or partner and partner.

7. Under the Statute of Frauds in our State (Sec. 3791, Rev. Gen. Stats. of Fla., 1920) resulting or constructive trust may be proven by parol evidence.

8. If a real estate broker as such be employed to negotiate the purchase of land for his principal and violates the principal's confidence by purchasing the land with his own money, and taking a deed therefor to himself, he becomes a constructive trustee for the principal's benefit, upon payment of the purchase price.

9. While a constructive trust may be proven by parol testimony the evidence to establish such a trust must be so clear,

strong and unequivocal as to remove from the mind of the Chancellor every reasonable doubt as to the existence of the trust.

10. The rule of law prohibiting dual agency while well settled is predicated on the fact that the interests of the principals are adverse or in conflict. Unless the principal contract for less, the agent is bound to serve him with all his skill, judgment and discretion.

11. He who undertakes to act for another in any matter of trust or confidence shall not in the same matter act for himself against the interest of one relying upon his integrity. So if an agent employed to purchase for another, purchases for himself, he will be considered as the trustee of his employer.

12. Every man to whom a business is entrusted by another has a trust to perform; and every man is a trustee who is to advise concerning or to operate the business of another.

An Appeal from the Circuit Court for Palm Beach County; C. E. Chillingworth, Judge.

Affirmed.

*E. J. L'Engle, J. W. Shands, M. D. Carmichael, Ernest Metcalf* and *Kearley & Fisher,* for Appellants;

*Fleming, Hamilton, Diver, Lichliter & Fleming* and *Wideman & Wideman,* for Appellee.

TERRELL, J.—This case is not without its difficulties. The essential facts on which it is grounded are as follows: Quinn, the appellant, was a real estate broker residing and doing business in Palm Beach County, Florida. Jennie E. Watson was a citizen of Boston, Massachusetts, and owned certain lands in Palm Beach County, more specifically described in the bill of complaint. She corresponded with

Quinn about the value and sale of these lands late in 1921 and early in 1922. About April 8th, 1922, Quinn told J. B. McDonald, Phipps' agent, that he had a price on Mrs. Watson's lands in Palm Beach County, and asked him (McDonald) to assist him (Quinn) to secure a purchaser for them. With Quinn's knowledge and consent McDonald conveyed this information to appellee, Phipps, who authorized McDonald to make Quinn a cash offer of $50,000.00 for the property. McDonald communicated the offer to Quinn, and on behalf of Phipps requested Quinn to convey the offer to, or negotiate the purchase from Mrs. Watson. McDonald asked Quinn to communicate the offer to Mrs. Watson by long-distance telephone, which Quinn declined to do, but instead agreed to proceed at once to Boston and negotiate the sale on behalf of Phipps and to communicate the result of his negotiation to Phipps at his New York office. On his arrival in Boston Quinn saw Mrs. Watson and learned that she would sell the property for $45,000.00. He said nothing about Phipps' offer, but procured an option agreement to buy the land from her in his own name, and then went to New York and told Phipps that ''he had tied up'' the property, but was unable to get a definite proposition at that time on account of uncertainty in the acreage. On his return to West Palm Beach Quinn told McDonald that he had tied up the property for himself. McDonald demanded an assignment of the option and offered to refund Quinn's expenses and the advance payment, and to pay the purchase price when due. Quinn refused to assign or to accept anything at the hands of McDonald.

Predicated on these facts, John S. Phipps on April 29th, 1922, filed his bill of complaint against Porte F. Quinn and Jennie E. Watson, praying that the option secured by Quinn from Mrs. Watson and the lands described therein be decreed to be held in trust by them for the sole benefit

of the complainant; that Quinn be directed to convey his interest in the said lands then held or later accruing to him under the said option to Phipps upon being reimbursed for any payments made by him on the purchase price and for expenses, that Phipps be decreed to stand in the place of Quinn in the purchase from Mrs. Watson, and that Mrs. Watson be ordered to convey the lands to Phipps upon compliance by him with the terms of the option.

A demurrer to the bill of complaint was overruled and defendants answered. John C. Gregory claimed half interest in the lands by virtue of a conveyance from Quinn dated August 2, 1922, long after this suit was filed, and on petition was allowed to intervene and file his answer. Quinn's answer denied all the material allegations of the bill. Testimony was taken by a special master and on final hearing, August 6, 1924, decree was entered as prayed in Phipps' bill. This appeal was prosecuted by Quinn and Mrs. Watson and intervening defendant Gregory from the final decree.

The first assignment of error is predicated on the refusal of the Chancellor to sustain the demurrer to the bill of complaint. The second assignment of error is predicated on the refusal of the Chancellor to dismiss the bill on final hearing, and the third assignment of error alleges that the final decree is not supported by the allegations and theory of the bill of complaint. All three assignments will be treated together since the primary question presented by them is whether or not there was a fiduciary relation established between Quinn and Phipps.

The term "fiduciary or confidential relation" is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confidence has been reposed and betrayed. The origin of the confidence is immaterial. The

rule embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies upon another. Words and Phrases (2nd series) 529; Irwin v. Sample, 213 Ill. 160, 72 N. E. Rep. 687 (quoting and adopting definition in 2 Pomeroy's Eq. Jur., par. 947, page 956).

In Beach v. Wilton, 244 Ill. 413, 91 N. E. Rep. 492, the Court, adopting the language of Pomeroy in his Equity Jurisprudence (3rd ed.), Vol. 2, Par. 956, defines the term fiduciary relations and outlines the conditions under which relief will be granted from its abuse, in the following words:

"Courts of Equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic, or merely personal. The rule as thus stated has been repeatedly quoted with approval by this Court. Roby v. Colehour, 135 Ill. 300, 25 N. E. 777; Thomas v. Whitney, 186 Ill. 225, 57 N. E. 808; Walker v. Shepard, 210 Ill. 100, 71 N. E. 422; Irwin v. Sample, 213 Ill. 160, 72 N. E. 687. The fiduciary relation exists between parties where there is a relation of trust and confidence between them, that is, where confidence is reposed by one party and a trust accepted by the other. In Mayrand v. Mayrand, 194 Ill. 45, page 48, 61 N. E. 1040, page 1041, this Court said: 'The term "fiduciary" or "confidential" relation, as used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confi-

dence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?' ''

Stripped of all embellishing verbiage it may be confidently asserted that every instance in which a confidential or fiduciary relation in fact is shown to exist will be interpreted as such. The relation and duties involved need not be legal, they may be moral, social, domestic or personal. If a relation of trust and confidence exists between the parties, that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused, that is sufficient as a predicate for relief. The origin of the confidence is immaterial.

Now let us inspect the record and see what it reveals to establish a relation of trust and confidence between Quinn and Phipps. It is shown that Quinn was a real estate broker doing business in West Palm Beach, that McDonald was the agent of Phipps, that Quinn on his own initiative approached McDonald and told him that he had a price on Mrs. Watson's property and requested him (McDonald) to assist him in finding a purchaser for it; that McDonald immediately communicated this information to Phipps, who authorized him (McDonald) to submit to Mrs. Watson through Quinn a cash offer of $50,000.00 for the property. It is further shown that McDonald urged Quinn to submit the offer to Mrs. Watson by long-distance telephone, but Quinn refused, agreeing instead to go to Boston in person to negotiate the purchase for Phipps. Quinn proceeded at once to Boston in compliance with his agreement with McDonald, but after interviewing Mrs. Watson, instead of purchasing for Phipps, he purchased the property for himself

at $45,000.00 and made no mention of Phipps' offer. The testimony of McDonald is positive as to all these facts and his testimony is strongly corroborated by that of David T. Layman, John S. Phipps, George M. Osborne and Mrs. Watson. The record also contains many revelations and recitations strongly supporting McDonald's testimony. It is true that Quinn denies every material allegation affirmed by McDonald, but testimony is uncorroborated and his conduct touching his relations to Phipps, Mrs. Watson and his co-defendant Gregory not only rebuts his testimony, but it was entirely out of harmony with any code of business or professional ethics known to this Court. The Chancellor believed McDonald's version of the facts and his finding is amply supported by the record.

Appellants urge that McDonald's testimony is materially weakened by his response to the following question propounded on direct examination: "Was he to make that proposition for Mr. Phipps?" His response was, "I certainly thought so. If I had not I would not have fooled with it." It is contended by appellants that McDonald's response, not being a direct affirmative, it had the effect of materially weakening or discrediting the force of his entire testimony. We do not consider this contention well grounded. If McDonald had been testifying with reference to the behavior of some physical object or phenomena on which the literal eye was or could be focussed, appellants' contention might be well founded; but in this case he was testifying with reference to a mental impulse or purpose concealed in the subconscious mind, something that could not be visualized or felt and could only be interpreted by the words and conduct emanating from the mind where concealed. From his words and his conduct Quinn led McDonald to believe, or as he expressed it, "certainly thought so" that he (Quinn) was going to Boston to submit Phipps'

offer to Mrs. Watson.  Quinn was bound by his words and
his conduct to McDonald.  If he had a different impulse
buried in his subconscious mind from that indicated by his
words to McDonald, Phipps nor McDonald had no way of
knowing it.  In this situation it would have been humanly
impossible for McDonald to have answered the question
in a more positive manner.  All he had was the impression
transmitted from Quinn's mind to his through Quinn's
words, and when he responded that he "certainly thought
so," his response had all the force and effect of a direct
affirmative.  His conclusion to his response, "If I had not,
I would not have fooled with it," together with numerous
other revelations in the record, serve the purpose of raising
the positiveness of McDonald's answer to the superlative
degree.  We think that both the allegations and proof fully
meet the test as here defined, and that they establish a rela-
tion of trust and confidence between Quinn and Phipps.

Interwoven with the question of whether or not a con-
fidential or fiduciary relation existed between Quinn and
Phipps is the further question of whether or not a con-
structive trust in favor of Phipps should be engrafted on
the sale from Mrs. Watson to Quinn.

A constructive trust is one raised by equity in respect
of property which has been acquired by fraud, or where,
though acquired originally without fraud, it is against
equity that it should be retained by him who holds it.  Con-
structive trusts arise purely by construction of equity in-
dependently of any actual or presumed intention of the
parties to create a trust and are generally thrust on the
trustee for the purpose of working out the remedy.  They
are said to arise from actual fraud, constructive fraud and
from some equitable principal independant of the existence
of any fraud. 26 R. C. L. 1232.

Discussing the circumstances that give rise to a con-

structive trust, Perry, on Trusts (6th ed.) par. 166, page 260, has the following pertinent comment:

"If a person obtains the legal title to property by such arts or acts or circumstances of circumvention, imposition, or fraud, or if he obtains it by virtue of a confidential relation, and influence under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity in order to administer complete justice between the parties, will raise a trust by construction out of such circumstances or relations; and this trust they will fasten upon the conscience of the offending party and will convert him into a trustee of the legal title, and order him to hold it or to execute the trust in such manner as to protect the rights of the defrauded party and promote the safety and interests of society. Such trusts are called *constructive* trusts. They differ from other trusts in that they are not within the intention or contemplation of the parties at the time the contract is made from which they are construed by the court, but they are thrust upon a party contrary to his intention and against his consent. The reason is that courts of equity have a large jurisdiction over all matters of trusts and confidence. They control and direct their administration and in certain cases they annul and put an end to them by directing the trustee to convey the trust property to the person beneficially interested."

From an examination of the text-books and many English and American cases touching this question the law seems well settled that a court of equity will raise a constructive trust and compel restoration where one through actual fraud, abuse of confidence reposed and accepted, or through other questionable means gains something for himself which in equity and good conscience he should not be permitted to hold. Miller v. Miller, 266 Ill. 522, 107 N. E.

Rep. 821; Kochorimbus v. Maggos, — Ill. —, 154 N. E. Rep. 235; Roche v. Roche, 286 Ill. 336, 121 N. E. Rep. 621; Rose v. Hayden, 35 Kan. 106, 10 Pac. Rep. 554.

Supporting this view the New York court in Wood v. Rabe, 96 N. Y. 414, text 425, said:

"There are two principals upon which a court of equity acts in exercising its remedial jurisdiction, which taken together, in our opinion, entitle the plaintiff to maintain this action. One is that it will not permit the statute of frauds to be used as an instrument of fraud; and the other, that when a person through the influence of a confidential relation acquires title to property, or obtains an advantage which he cannot conscientiously retain, the court, to prevent the abuse of confidence, will grant relief  *   *   *. The principle, that when one uses a confidential relation to acquire an advantage which he ought not in equity and good conscience to retain, the court will convert him into a trustee, and compel him to restore what he has unjustly acquired, or seeks unjustly to retain, has frequently been applied to transactions within the statute of frauds."

Under such circumstances as are presented here it is essential that the confidential relation be established before a constructive trust will be raised; but is not essential that such confidential relation be predicated on that of husband and wife, parent and child, guardian and ward, attorney and client, principal and agent, or partner and partner, as some of the authorities may seem to imply. The test is whether or not the relation is in fact shown to exist. The origin of the confidence is immaterial and the relation may be legal, moral, social, domestic or personal. Quinn being a real estate broker, he by that means served notice on the public generally that its confidence was invited if interested in any transaction pertaining to that business. He not only invited Phipps along with the public generally, but solicited his confidence and patronage

through McDonald who brought them together. It is true that the contract between Quinn and Phipps was oral, that Phipps advanced no money, the purchase being made by Quinn in his own behalf, with his own funds, but he knew at the time that Phipps for reasons personal to himself was anxious to secure the ·property, that he was amply able to purchase it, that he (Quinn) was under obligation to negotiate for him (Phipps), and that Phipps was relying on him to do so. The fact that Quinn purchased with his own money and declined to take expense money when offered him by McDonald does not help his case. Phipps was known by Quinn to be a man of means, amenable to the law, who could and would respond on demand to the price offered for the lands, and more if required, to secure them.

It is contended by Quinn that the mere breach of his promise or agreement to purchase for Phipps did not establish a constructive trust in favor of Phipps. Many cases are cited in support of this phase of his defense, all of which have been analyzed carefully. Some of these cases are predicated on facts materially different from the prevailing facts in the case at bar, while the others are predicated on statutes of frauds that either prohibit proof of a constructive trust by parol evidence or embrace some other provision peculiar to the jurisdiction where enunciated. Under the statute of frauds in our statute (Sec. 3791 Rev. Gen. Stats. of Fla., 1920) a resulting or constructive trust may be proven by parol evidence. Lofton v. Starrett, 23 Fla. 565, 2 South. Rep. 837; Boswell v. Cunningham, 32 Fla. 277, 13 South. Rep. 354; Booth v. Lennoz, 45 Fla. 191, 34 South. Rep. 566; Geter v. Simmons, 57 Fla. 423, 49 South. Rep. 131; Johnson v. Sherehouse, 61 Fla. 647, 54 South. Rep. 892; Rogero v. Rogero, 66 Fla. 6, 62 South. Rep. 899. If Phipps and Quinn had been dealing at arms length he (Quinn) might not have been bound by his agree-

ment to purchase for Phipps, but having undertaken to act for Phipps, he becomes an agent, so our statute of frauds and decisions thereon would be a complete answer to this part of his (Quinn's) defense.

We have searched diligently and have found nothing in support of Quinn's contention on this point except the cases referred to in the first part of the last preceding paragraph which are not in point here, and some of the early English cases which were later repudiated.   Bartlett v. Pickersgill, 1 Eden 515; also 4 East 577, Note.   See also 2 Story's Eq. Jur., par. 1201; 2 Sugden on Vendors & Purchasers (9th ed.) 163, and Browne on Frauds, par. 96; Burden v. Sheridan, 36 Iowa 125.   Bartlett v. Pickersgill, the leading early English case on this point, was decided in 1760, and the doctrine announced therein appears to have continued to be the law in England till 1829, when it was repudiated in Lees v. Nuttall, 1 Russ. & Myl. Ch. 53, where it was held that if an agent employed to purchase an estate becomes the purchaser for himself, he is to be considered as a trustee for his principal.   Lees v. Nuttall was affirmed in 2 Myl. & K. Ch. 819, where the agency was created wholly by parol.   Supporting this view in Heard v. Pilley, 4 Ch. App. L. R. 548, text 552, another English case in which the agent was appointed by parol, the Lord Chancellor in part said:

"I cannot at all accede to the argument urged in reply, that under these circumstances when the agent goes to his principal and says, 'I will go and buy an estate for you,' it is not a fraudulent act on his part afterward to buy the estate for himself and to deny the agency.   I think that would be an attempt to make the statute of frauds an instrument of fraud."

A casual review of the law governing this element of defense impels the conclusion that under the early English

rule Quinn's agreement to purchase for Phipps would not have created a constructive trust in favor of Phipps, which conclusion is supported by some of the cases in this country predicated on statutes of frauds which prohibit proof of a constructive trust by parol, but such cases are not binding here, because by the terms of the statute of frauds in this State a constructive trust may be proven by parol. The early English rule is repudiated by all the late English cases and the modern current of authority both in this country and in England is to the effect that if an agent be employed to negotiate the purchase of land for his principal, and violates the principal's confidence by purchasing the land with his own money, and taking a deed therefor to himself, he becomes a constructive trustee for the principal's benefit, upon payment of the purchase price. Boswell v. Cunningham, 32 Fla. 277, 13 South. Rep. 354; Patrick v. Kirkland, 53 Fla. 768, 43 South. Rep. 969; Skinner Mfg. Co. v. Douville, 57 Fla. 180, 49 South. Rep. 125, 21 R. C. L. 829; Harrop v. Cole, 85 N. J. Eq. 32 95 Atl. Rep. 378; Young v. Hughes, 32 N. J. Eq. 372; Rose v. Hayden, 35 Kan. 106, 10 Pac. Rep. 554, 57 Am. Rep. 145 (and cases cited); Fox v. Simons, 251 Ill. 316, 96 N. E. Rep. 233; Johnson v. Hayward, 74 Neb. 157, 103 N. W. Rep. 1058. 107 N. W. Rep. 384; Trice v. Comstock, 121 Fed. Rep. 620, 57 C. C. A. 646, 61 L. R. A. 176; Rogers v. Genung, 76 N. J. Eq. 306, 74 Atl. Rep. 473; Gardner v. Ogden, 22 N. Y. 327, 78 Am. Dec. 192; Jaeger Co. v. Hannon, 90 N. J. Eq. 396, 108 Atl. Rep. 1; Brookings Land & Trust Co. v. Bertness, 17 S. D. 293, 96 N. W. Rep. 97; Wood v. Rabe, 96 N. Y. 414, 48 Am. Rep. 640; Bachranch v. Fleming, 269 Pa. 350, 112 Atl. Rep. 445; Beach v. Wilton, 244 Ill. 413, 91 N. E. Rep. 492; Wright v. Smith, 23 N. J. Eq. 106; Chastain v. Smith, 30 Ga. 96. In the last named case the Georgia statute of

frauds is similar to ours, and among other things the Court said:

"Where one person agrees, as agent, to buy land for another as his principal, and does buy it, but takes the title in his own name, this title in his hands stands affected with a resulting trust for the benefit of the principal by operation of law, and the case is not within the statute of frauds, resulting trusts being expressly excepted from the operation of the statute."

Some authorities hold that where the agent furnishes the purchase money with the consent of the principal, it will be construed as a loan, and the agent will hold the property purchased in trust for the principal as security to himself for the money advanced by him. Rose v. Hayden, *supra.* So far as we have been able to find, even those English and American cases which decline to engraft a constructive trust for the breach of a parol agreement to purchase for another hold that if the agent purchases in his own name with the money of his principal equity will raise a constructive trust in the purchase in favor of the principal. Burden v. Sheridan, 36 Iowa 125; Pinnock v. Clough, 16 Vt. 500; Nixon's Appeal, 63 Pa. St. 279.

This Court has repeatedly announced the rule that a constructive trust may be proven by parol testimony, but that the evidence to establish such a trust must be so clear, strong and unequivocal as to remove from the mind of the Chancellor every reasonable doubt as to the existence of the trust. Lofton v. Sterrett, 23 Fla. 565, 2 South. Rep. 837; Geter v. Simmons, 57 Fla. 423, 49 South. Rep. 131; Johnston v. Sherehouse, 61 Fla. 647, 54 South. Rep. 892; Rogero v. Rogero, 66 Fla. 6, 62 South Rep. 899; McGill v. Chappelle, 71 Fla. 479, 71 South. Rep. 836. We think the proof adduced amply met the test here. Hanson v. Hanson, 78 Neb. 584, 111 N. W. Rep. 369.

It is also contended by Quinn that he was the agent of the owner, Mrs. Watson, and could not therefore have been the agent of Phipps at the same time.   On the question of agency the record shows that for some months prior to Quinn's interview with McDonald, April 8th, 1922, several communications had passed between him and Mrs. Watson relative to the sale of the property, but the matter was still open, their minds had not met and there was no authorization from Mrs. Watson to Quinn to sell till her letter of April 10, 1922, which gave Quinn an exclusive listing for 30 days.   This letter had not been received by Quinn at the time he agreed to submit Phipps' offer to Mrs. Watson, consequently he was not authorized to act as her agent, but if he had been, we do not see that it would materially affect this transaction.   The rule of law prohibiting dual agency while well settled is predicated on the fact that the interests of the principals are adverse or in conflict.   Unless the principal contracts for less, the agent is bound to serve him with all his skill, judgment and discretion.   21 R. C. L. 827.   In a letter dated April 1st, 1922, Mrs. Watson had told Quinn that she would take $75,000.00 for the property. This letter and that of April 10, as above referred to gave Quinn an exclusive contract to sell for thirty days; but such a contract if it in fact had been in existence was in nowise in conflict with the agreement on the part of Quinn to submit Phipps' offer to Mrs. Watson.   Quinn led Phipps to believe that he (Quinn) would submit his (Phipps') offer to Mrs. Watson and would make the trip to Boston for that purpose.   The evidence shows conclusively that if Phipps had not believed that Quinn was going to Boston to submit his (Phipps') offer, he would have arranged to purchase through business representatives there.   If there were reasons known to Quinn why he could not carry out his agreement with Phipps, it was his duty to

fully disclose such reasons to Phipps. He cannot invite and accept Phipps' confidence and then betray the trust reposed in him. Walker on Real Estate Agency, 578; Johnson v. Hayward, *supra;* Caster v. Richardson, 18 Colo. 496; 33 Pac. Rep. 163; Crowe v. McLear, 200 Ky. 621, 255 S. W. Rep. 261; Harris Bros. v. Reynolds, 17 N. D. 16, 114 N. W. Rep. 369.

In Rogers v. Genung, *supra,* the general rule governing principal and agent in transactions like this is stated in substance as follows: He who undertakes to act for another in any matter of trust or confidence shall not in the same matter act for himself against the interest of one relying upon his integrity. Gardner v. Ogden, 22 N. Y. 327; Davoue v. Fanning, 2 Johns. Ch. 252, text 260. So if an agent employed to purchase for another, purchases for himself, he will be considered as the trustee of his employer. The rule extends to all cases in which confidence has been reposed, and applies as strongly to those who have gratuitously or officiously undertaken the management of another's property as to those who are engaged for that purpose and paid for it. Wright v. Smith, *supra.*

It is contended by appellants that at the time Quinn agreed to purchase for Phipps, he had purposed in his own mind to purchase the property for himself and had made all necessary arrangements ·to finance the purchase. There is evidence in the record to support this contention, but this information was at no time brought home to Phipps, and it was testified positively on behalf of Phipps that if Quinn had not agreed to submit his offer to Mrs. Watson he would have undertaken the purchase through business associates in Boston.

Appellants are content to rest their case on authority of Parramore v. Hampton, 55 Fla. 672, 45 South. Rep. 992. That case was brought to engraft a trust on an interest in

certain lands purchased by Hampton from the Tedders, Parramore having no legal or contract right in the lands so involved. Hampton was not a real estate broker, nor was he the agent of Parramore in the management or control of the property, and occupied no fiduciary relation to him in respect to it. The entire property belonged to Hampton and the Tedders and none of Parramore's money went to purchase the option from the Tedders by Hampton. Hampton did not invite the confidence of Parramore, they dealt at arm's length. Hampton may have breached his agreement with Parramore, but this Court directly held that no resulting or constructive trust could be established on the circumstances presented. In the case at bar an entirely different combination of circumstances is presented. Here we find Quinn, a real estate broker, inviting the confidence of Phipps, the lands involved were well located, were attractive and valuable, and for personal reasons were very much desired by Phipps, all of which was known to Quinn. Quinn induced Phipps to believe that he had the lands listed for sale and asked him for an offer on them. On the basis of such inducement Phipps made his offer and Quinn led him to believe that he would submit it to the owner, Mrs. Watson, and would go to Boston for that purpose, but instead of negotiating for Phipps he negotiated and purchased the lands for himself at a consideration less than was offered by Phipps. It is true that Phipps furnished no part of the purchase money, and the contract was in parol, but that can make no difference. Quinn cannot in equity and good conscience undertake the agency for Phipps, then purchase in his own name, with his own money, in violation of his agreement with Phipps and in violation of the confidence reposed in him by Phipps and be allowed to profit by the fruits of his double-dealing. Rose v. Hayden, *supra;* Brookings Land & Trust Co. v. Bertness, *supra.*

The real estate business is not an avenue by which one may practice the tricks of his trade or prey on the innocent and unsuspecting purchaser, nor is it a cloak to cover fraud and deception, or a means for designing persons to short-circuit those who would deal squarely and in good faith. It is indeed a highly respectable business or profession; its ethics are well defined and presumed to be known to those who patronize or engage in that business. No business known to modern society has a longer or more respectable history. Real estate is a primary security for credit in all the civilized countries of the earth, and the real estate broker in our time, and long has been, the medium through which annually many millions of dollars in earnings and savings are secured or invested. He is the agent of his principal in every sense and when that relation is undertaken a fiduciary relation is created which bars the agent from becoming interested in the business or property antagonistic to his principal without his knowledge or consent. Every man, in other words, to whom a business is entrusted by another has a trust to perform; and every man is a trustee whose business is to advise concerning or to operate the business of another.

This holding is not only well grounded on authority, it is abundantly supported in morals and reason, and when viewed in the light of the history of our legal development it is as inevitable as the fact of night following day, or the seasons recurring in their order. ''The law of every country is the outcome and result of the economic and social conditions of that country as well as the expression of its intellectual capacity for dealing with these conditions, the causes which modify the law are usually to be sought in changes which have passed upon economic and social phenomena. When new relations between

men arise, or the old relations begin to pass into new forms, law is called in to adjust them.'' Legal doctrines are predicated on reason and custom, mark their growth from rude beginnings, and like the order of the universe are constantly changing to adjust the new relations of society. We have no better proof of this than the development of our common law and system of equity. The spirit of the Common Law, Pound.

Our ''Anglo-American legal tradition'' which we term the common law is primarily an English institution. It is not a fixed body of well defined rules embodied in the written records of this or the mother country, but is rather a method of juristic thought or manner of treating legal questions worked out from time to time by the wisdom of mankind. It is a doctrine of reason applied to experience. Its rules were promulgated in feudal times, an age of dense ignorance, crude customs and primitive society, when slight value was attached to life, liberty or property, when commerce was almost unknown and property was of little value. In the time of Henry II the King's courts became organized and from these local rules or customs began to evolve the common law. By the genius of Coke these rules or customs were remolded into vital pulsating principles and were passed on to the English Colonies in this country where they have by reason and interpretation attained their most complete logical development. We are therefore more essentially a common law country than England herself.

Likewise our system of equity was built up from time to time by the chancellors, the first of whom were members of the clergy, were often versed in the canon law, but knew little or nothing of civil or common law. In the times of Edward I and Edward III the jurisdiction of the chancellor was more specifically defined, and he was made an instrument for amending and extending the law. Originally

equity infused morals into the law by prohibiting the unconscionable exercise of legal rights. In our day we are preventing the anti-social exercise of legal rights. We are also imposing social restrictions limiting the freedom of contract, and limiting the power to dispose of property, all in the interest of society. These fundamental changes in our law, sometimes the product of legislation, but more often the work of the courts, are prompted by the conduct of those who in some manner place themselves in opposition to the approved social order. Equity and the chancellor were designed to scrutinize the conduct and search the consciences of those responsible for calling the law into action and protect those who pledge and promise in good faith, against those who would overreach or in other ways act illegally or anti-socially.

It is next contended that no valid decree could be entered in this cause because necessary parties were not joined in the suit. It is asserted in other words that the "Phipps interests" represented by the heirs of Henry Phipps, deceased, are the real parties interested, while the suit is brought in the name of John S. Phipps individually.

This court is mindful of the rule to the effect that all persons materially interested, either legally or beneficially in the subject-matter of a suit should be made parties to it, either as plaintiffs or defendants, however numerous they may be, so there may be a complete decree binding on all of them. The reason for the rule is that the court may be enabled to make a complete decree between the parties to prevent future litigation by removing the necessity of a multiplicity of suits and to make it certain that no injustice is done to the parties before it, or to others who are interested in the subject-matter, if a decree were entered which might be otherwise grounded upon a partial view of the real merits. When all the parties are before the court the whole case may be reviewed, but it may not when all the

conflicting interests are not presented on the pleadings of the original parties thereto. Gregory v. Stetson, 133 U. S. 579, 10 Sup. Ct. Rep. 422; Story's Eq. Pl. 72.

There is some evidence tending to show John S. Phipps' connection with the "Phipps interest," but the decided weight of the evidence is to the effect that John S. Phipps wanted the property for personal reasons; that he was anxious to get it; that the offer of fifty thousand dollars was made for it in his behalf; that he was amply able to pay that price, and that all the negotiations were carried on with the end in view of purchasing for himself and not for the Phipps interests. It is not therefore made to appear that all the necessary parties were not before the court.

It is further contended that even if Phipps' tender was good, no part of it should have been returned to him.

Some time after suit was filed Phipps paid $50,000.00 into the Court as tender to make good on his cash offer for the property. The Chancellor decreed that of the $50,000.00 so tendered, $35,000.00 be paid to Mrs. Watson to meet the principal on the mortgage held by her; that $1,820.00 be paid to Gregory in lieu of interest paid on the mortgage to Mrs. Watson from the date of its execution, May 12, 1922, to date of tender; that $10,000.00 be paid to Gregory to replace the amounts paid by him to Quinn to make the cash payment to Mrs. Watson, and that the balance of $3,180.00 be paid or returned to Phipps.

Appellants' contention is predicated on the assumption that when money is paid into Court the party paying it loses any right to it and the Court has no authority to make an order in the same case transferring the title to or permitting the one paying it to withdraw the money. We find no warrant for such a contention. The rule is well settled that where one pays an amount tendered into Court as a condition precedent to affirmative relief, such payment does

not transfer the title in the money to the other party, but it remains in the one making the tender, subject to the final outcome of the suit.  26 R. C. L. 658.

It is contended on behalf of the intervenor, Gregory, that his equity is superior to that of Phipps because he (Gregory) holds title to a one-half interest in the lands involved as a *bona fide* purchaser for value and without notice.

The record does not support this contention.  Phipps' bill and notice of *lis pendens* were filed April 29th, 1922. Phipps knew nothing whatever of Gregory's claim till after this date.  There was an agreement between Quinn and Gregory (which was never recorded) to purchase on the part of Gregory a one-half interest in the property.  It was dated April 27, 1922, and shows a cash payment on the part of Gregory to Quinn of $500.00.  It showed further that Gregory was to furnish the funds to make the property salable, and was to pay an additional payment of $9,500.00, making a full payment of $10,000.00 when deed was "properly executed and the abstract of title shows that the property is free of all encumbrance."  May 8, 1922, Gregory left two checks with the Farmers Bank & Trust Company aggregating $14,500.00, to be turned over to Quinn when the deed "was all right."  He left West Palm Beach the following day and remained away all summer.  He had no correspondence with his agent Quinn while he was gone, but left the whole transaction in his hands.  Mrs. Watson executed her deed to Quinn May 4, 1922, and same was recorded May 12, 1922.  Quinn in turn on the last named date executed his mortgage to Mrs. Watson to secure deferred payments payable within three years from date. This mortgage was recorded May 13, 1922, and on August 2, 1922, Quinn joined by his wife conveyed a one-half interest in the property to Gregory.

The position of Gregory may be unfortunate, but he left

the whole matter with Quinn, and though he was an experienced real estate man, he made no effort whatever to exercise his reserved right to demand and examine the abstract of title to the property before his money was paid to Quinn. Such an examination on May 8th, 1922, when his checks were turned over to Quinn would have shown the existence of this suit, which Quinn was aware of at the time of all the foregoing transactions. It therefore appears that Phipps had no knowledge whatever of Gregory's claim, that Gregory had ample means to protect himself, but relied on his agent Quinn, who deceived him; that the final decree leaves him in the position he was in before his transaction with Quinn, so he is not in position to complain. In other words, the acts of Quinn, the agent, became the acts of Gregory, the principal, and he is bound thereby.

The eleventh to twenty-third assignments of error exclusive of the fourteenth assignment are predicated on the admission of certain oral and documentary testimony. These, assignments have all been examined carefully, and on the whole record error is not made to appear.

For the reasons announced in this opinion the decree of the Chancellor was properly entered, and is hereby affirmed.

WHITFIELD, P. J., AND BUFORD, J., concur.

ELLIS, C. J., AND STRUM AND BROWN, J. J., concur in the opinion.

WHITFIELD, J., concurring:

The statutes of the State of Florida contain the following:

"No estate or interest" in lands * * * "shall be created" "in any other manner than" by deed or will "or

by the act and operation of law.'' Sec. 3787, Revised General Statutes, 1920. ''A trust in lands may arise or result by the implication or construction of law, or be transferred or extinguished by the act and operation of law.'' Sec. 3791, Revised General Statutes 1920.

''A constructive trust is one that arises when a person, clothed with some fiduciary character, by fraud or otherwise gains some advantage to himself. Courts construe this to be an advantage for the *cestui que trust,* or a constructive trust.'' Sec. 27, Perry on Trusts (6th ed.) 18.

There are at least three classes of constructive trusts, which are not based upon intention but are imposed in order to prevent unjust enrichment:

(1) If A's money is used by B *without* A's *consent* in purchasing property in B's' name, B holds the property upon a constructive trust for A. This is the familiar case in which, where one person acquires property by the wrongful use of the property of another, the latter is allowed to trace his property into its product, to follow the *res.* It is obvious that this class of trusts is not based in any way on intention, but is imposed by law in order to prevent one person from profiting by the wrongful use of the property of another. Even in States in which purchase-money resulting trusts have been abolished by statute, this class of constructive trusts is retained.

(2) If B stands in a fiduciary relationship to A and in violation of his duty as fiduciary acquires property, he holds the property upon a constructive trust for A. In this class of cases it is immaterial that B uses his own money in acquiring the property. This class of trusts is not based on intention, but is imposed by law in order to prevent a fiduciary from profiting by a violation of his duty of loyalty to his principal, even though the profit may not be at the principal's expense.

(3)   If A owns property which is about to be sold for non-payment of taxes, or on a foreclosure of a mortgage, or on execution of a judgment, and is induced to refrain from preventing the sale by an oral promise made by B to buy in the property on the sale and to reconvey it to A, and B thereupon buys in the property, B becomes constructive trustee for A, although B buys the property with his own money.   In this class of cases a trust is raised not for the purpose of carrying out A's intention but for the purpose of putting the parties *in statu quo,* in order to prevent B from profiting at A's expense.

Not infrequently it happens that the circumstances are such that if A fails to prove facts necessary to raise a purchase-money resulting trust, or if by statute such resulting trusts are abolished, he may, nevertheless, prove facts sufficient to raise a constructive trust of one or another of these three classes.   Vol. 40 Harvard Law Review, 674 Note.

An equitable estate or interest in lands in the nature of a constructive trust may be decreed as arising by operation of law where an agency or other fiduciary relation existed between the parties with reference to the lands, and by a breach of duty in such relation one of the parties acquires title to the lands or an interest therein contrary to the substantial legal or equitable rights of the other party (Boswell v. Cunningham, 32 Fla. 277, 13 South. Rep. 354; Johnson v. Hayward, 74 Neb. 157, 103 N. W. Rep. 1058, 5 L. R. A. (N. S.) 112, and Notes; Trice v. Comstock, 121 Fed. Rep. 620, 61 L. R. A. 176; Rose v. Hayden, 35 Kan. 106, 10 Pac. Rep. 554; Davis v. Hamlin, 108 Ill. 39; Allen v. Jackson, 122 Ill. 567, 13 N. E. Rep. 840; Rogers v. Genung, 76 N. J. Eq. 306, 74 Atl. Rep. 473, reversing Rogers v. Genung, 75 N. J. Eq. 13, 71 Atl. Rep. 230; Harrop v. Cole, 85 N. J. Eq. 32, 95 Atl. Rep. 378; Harrop v. Cole,

86 N. J. Eq. 250, 98 Atl. Rep. 1085) ; or where one has
an interest in lands and agrees with another that the latter
shall acquire the land for the benefit of the first. Patrick
v. Kirkland, 53 Fla. 768, 42 South. Rep. 969; Thomas v.
Goodbread, 78 Fla. 278, 82 South. Rep. 835; 26 R. C. L.
1244, Par. 91; or where a party furnishes a consideration or
agrees to pay a consideration to be used in acquiring lands
for him by another. Ward v. Spivy, 18 Fla. 847; Ca-
ruthers v. Williams, 21 Fla. 485; Avery v. Stewart, 136
N. C. 426, 48 S. E. Rep. 775. But where no fiduciary re-
lations exist, a breach of a mere verbal promise to purchase
lands for another, who then had no interest in the lands
and who did not pay and did not promise to pay any con-
sideration for the service or expenses, and furnished no
part of the purchase price, will not by operation of law
create a constructive trust in the lands to be decreed by a
court of equity. Parramore v. Hampton, 55 Fla 672, 45
South. Rep. 992; Stewart & Co. v. Marcus, 207 N. Y. Supp.
685, 124 Misc. Rep. 86.

The mere breach of an oral agreement, standing alone,
though often a moral wrong, is not sufficient to establish
that fraud in procuring the title which is requisite to ren-
der the grantee a trustee *ex maleficio,* although the fact of
such breach may, of course, be looked to, in connection
with the other circumstances of the case, as sometimes con-
stituting one of several links in a chain of facts going to
prove fraud. If this were not so, the statute of frauds
would practically be annuled, because no case can arise in
the courts under it except where such a breach is charged,
other than cases of fraud, either positive or constructive.
26 R. C. L. 1239. See 42 A. L. R. 28, Notes. See Parramore
v. Hampton, 55 Fla. 672, 45 South. Rep. 992; Nash v. Jones,
41 W. Va. 769, 24 S. E. Rep. 592; Mitchell v. Wright,
155 Ala. 458, 46 South. Rep. 473; 1 Perry on Trusts (6th
ed.) 181, 206, Notes; 39 Cyc. 179; Watson v. Erb, 3 Ohio

St. 35; Largey v. Leggat, 30 Mont. 138, 75 Pac. Rep. 950; Hackney v. Butts, 41 Ark. 393; Allen v. Richard, 83 Mo. 55. See also Bourke v. Callanan, 160 Mass. 195, 35 N. E. Rep. 460; McDonald v. Conway, — Mass. —, 150 N. E. Rep. 200.

In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property either in the hands of the original wrongdoer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust. The forms and varieties of these trusts, which are termed *ex maleficio* or *ex delicto,* are practically without limit. The principal is applied wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrongdoer. 3 Pomeroy's Eq. Jur. (4th ed) 1053; Pharr v. Fink, 151 Ark. 305, 237 S. W. Rep. 728; 39 Cyc. 182, 188.

When an agent employed to purchase for his principal, purchases for himself, all the profits and advantages gained in the transaction belong to the principal, and the agent will be held to have the property as trustee for his principal. Such a trust comes within the exception provided for in the statute of frauds, as it arises out of the construction of law, and may be established by parol. Boswell v. Cunningham, 32 Fla. 277, 13 South. Rep. 354. See 2 C. J.

705; Patrick v. Kirkland, 53 Fla. 768, 43 South. Rep. 969; Thomas v. Goodbread, 78 Fla. 278, 82 South. Rep. 835; Ward v. Spivey, 18 Fla. 847; Jenckes v. Cook, 9 R. I. 520. But the existence of an agency or other fiduciary relation or an interest in the land or a consideration furnished or promised or other equitable matters must be shown where a constructive trust in lands is sought to be established because of alleged breach of faith in the sale or purchase of land. See Parramore v. Hampton, 55 Fla. 672, 45 South. Rep. 922; Aborn v. Padelford, 17 R. I. 143, 20 Atl. Rep. 297; Whiting v. Dyer, 21 R. I. 278, 43 Atl. Rep. 181; Ward v. Spivey, 18 Fla. 847; 1 Perry on Trust (6th ed.) 181; 23 A. B. R. 1491, Notes 1500.

A real estate broker is one who, as a business, procures the purchase or sale of lands, acting as middleman or nego-itator between potential vendors and purchasers to bring them together and arrange the terms. 2 Clark & Skyles on Agency, 799; Handley v. Shaffer, 177 Ala. 636, 59 South. Rep. 286.

The engagement of a broker is like to that of a proxy, a factor or other agent; but, with this difference, that the broker, being employed by persons who having opposite interests to manage, he is, as it were, agent both for the one and the other to negotiate the commerce and affair in which he concerns himself. Thus, his engagement is two-fold, and consists in being faithful to all the parties in the execution of what every one of them entrusts him with. And his power is not to treat, but to explain the intentions of both parties, and to negotiate in such a manner as to put those who employ him in a condition to treat together person-ally. 1 Domat, bk. 1, tit. 17, 1, Strahan's trans.; Hooper v. State of California, 155 U. S. 648, text 657, 15 Sup. Ct. Rep. 207.

The vocation of real estate agent or broker, as a distinct

occupation for service to the public, has for many years been recognized in this State by requiring privilege licenses to be procured by such agents òr brokers; and the provisions of Chapters 10233 and 11336, Acts of 1925, prescribing penalties for any "improper, fraudulent or dishonest dealing" by a real estate broker, is merely declaratory of the general rules of law relative to the standards of conduct by such licensed persons.

A broker is but an agent, and is bound to follow the directions of his principal, or give notice that he declines to continue the agency. Galigher v. Jones, 129 U. S. 193, text 198; 9 C. J. 515. See also Skinner Mfg. Co. v. Douville, 57 Fla. 180, 49 South. Rep. 125.

If a broker employed to purchase property buys it for himself, he is considered a trustee for the principal. 9 C. J. 538; Harrison v. Craven, 188 Mo. 590, 87 S. W. Rep. 692.

Contracts between real estate brokers and their customers for the purchase or sale of real estate may be implied. Varn v. Pelot, 55 Fla. 357, 45 South. Rep. 1015.

The law requires a real estate broker to act in unqualified good faith in all matters pertaining to finding purchasers or in making sales of property for vendors and in engagements or undertakings to communicate offers from others for the purchase of property; but a status of agency or other fiduciary relation must exist by some means or process recognized by law, in order to create the obligations and duties that the law imposes with resulting consequences on real estate brokers who have fiduciary relations with others in the sale or purchase of land. Whether the agency or other fiduciary relation existed upon a breach of duty in which relation an estate or interest in the nature of a constructive trust in real estate may be decreed in equity, should be determined from the express terms of an engage-

ment or agreement, or by the implication that arises from a due consideration of all the facts and circumstances that are pertinent in each case as it arises. See 2 C. J. 432, et seq.

A real estate broker is not by law required to engage or to undertake to communicate to the owner of property an offer made to him for the purchase of the property; but if he does so engage or promise or undertake, under such circumstances as to create a fiduciary relation, he can not equitably purchase the property for himself to the detriment or disadvantage of the person whose offer he engaged or undertook to communicate to the party having the property for sale. The promise, undertaking or engagement that creates the fiduciary relation may be implied from the relations and conduct of the parties as shown by express agreement. An adjudication of an implied fiduciary relation must be justified by the facts and circumstances properly adduced. These principles are peculiarly applicable when a constructive trust in land is sought to be established because of alleged breach of duty in a fiduciary relation. In such cases where the existence of a fiduciary relation is an issue, and the relation is not shown by an express agreement, the fiduciary nature of the relation should be established by clear and convincing evidence. See Johnston v. Sherehouse, 61 Fla. 647, 54 South, Rep. 892; 39 Cyc. 193, 633; Lefkowitz v. Silver, 182 N. C. 339, 109 S. E. Rep. 56, 23 A. L. R. 1491 and Notes; Hayden v. Dannenberg, 42 Okla. 776, 143 Pac. Rep. 859, Ann. Cas. 1916D, 1191; Dooly v. Pinson, 145 Ala. 659, South. Rep. 664; 3 Pomeroy's Eq. Juris. (4th ed.) 1058, p. 2421, Notes.

It is a fundamental principle that the relation of agency can exist only by the will of the principal and with the consent of the agent. 2 C. J. 432.

An agency is created—authority is actually conferred

very much as a contract is made, *i. e.*, by an agreement between the principal and agent that such a relation shall exist. The minds of the parties must meet in establishing the agency. The principal must intend that the agent shall act for him, and the agent must intend to accept the authority and act on it, and the intention of the parties must find expression either in words or conduct between them. Central Trust Co. of N. Y. v. Bridges, 57 Fed. Rep. 753, 764.

A party may voluntarily assume a confidential relation toward another, and if he does so, he cannot thereafter do any act for his own gain at the expense of such relation. Allen v. Jackson, 122 Ill. 567, 13 N. E. Rep. 840. See also Winn v. Dillon, 27 Miss. 494; Trice v. Comstock, 121 Fed. Rep. 620; Russell v. Wade, 146 N. C. 116, 59 S. E. Rep. 345; Bryan v. McNaughton, 38 Kan. 98, 16 Pac. Rep. 57.

To lead a person reasonably to suppose that you assent to an oral arrangement is to assent to it, wholly irrespective of fraud. Assent, in the sense of the law, is a matter of overt acts, not of inward unanimity in motives, design, or the interpretation of words. O'Donnell v. Clinton, 145 Mass. 461, text 463, 14 N. E. Rep. 747.

One who leads another reasonably to suppose that he is accepting the agency cannot escape its consequences, though he used no express words and carefully avoided any express acceptance. Wright v. Rankin, 18, 18 Grant Ch. (U. C.), 625; 1 Mechem on Agency (2nd ed.), p. 181, Note.

An agency may be implied from the words and conduct of the parties; and the parties are held to intend what their words and conduct fairly mean under the circumstances as they are made to appear. See 2 C. J. 439.

Where a principal, having no interest in the land to be purchased, makes a verbal contract with a real estate broker to buy for him, and the latter purchases the land in his own name and with his own funds and then repudiates the

agency and refuses to convey to the principal, the question whether the contract is within the statute of frauds and not enforceable against the agent, depends upon whether the contract in its essence and effect was one of agency, or was it one for the purchase of real estate. If it was the former, it creates a trust relation, is not within the statute of frauds, and can be established by parol; if the latter, the parties are to that extent dealing with each other as principals and the contract is within the statute and can only be established by such a writing as will meet the requirements thereof. Matney v. Yates, 121 Va. 506, 93 S. E. Rep. 694.

The question here is whether there was a relation of agency between Quinn, a real estate broker, and Phipps, who at Quinn's solicitation through McDonald, made to Quinn an offer for land listed with Quinn for sale, not whether there was a contract for the purchase of land; and it is not material in this case whether Phipps was bound by the offer he requested the broker to present to the owner, or whether Quinn was to be compensated by Phipps.

If Quinn, a real estate broker, is clearly shown to have accepted a request to act, or assumed to act, as the agent of Phipps, whose duty as such agent required him to present the offer of Phipps to the owner of the property, if it could be done without violating Quinn's duty to the owner, and Quinn did not present Phipps' offer, but bought the property himself for less or equal price, then Quinn should be decreed to be constructive trustee for Phipps. Quinn could have presented Phipps' offer to the owner as he apparently acquiesced in a request to do, without violating his duty to the owner, and the offer of Phipps would have been considered by the owner if it had been presented by Quinn. See 9 C. J. 518, 541.

A mere parol agreement to purchase land for another,

there being no agency or other fiduciary relation between the parties, and the promisee having no interest in the land and giving no consideration for the promise, does not create such a fiduciary relation that the promisor will be decreed to be a constructive trustee if he purchases the property for himself at his own expense and with his own money. The test is whether the act is inconsistent with *duties* resulting from a fiduciary relation shown to exist between the parties. See 1 Perry on Trusts (6th ed.), 206, and Notes; Parramore v. Hampton, 55 Fla. 672, 45 South. Rep. 992; Pharr v. Fink, 151 Ark. 305, 237 S. W. Rep. 728.

On appeal from a decree based upon evidence, the findings of fact by a Chancellor do not as a matter of law add to the probative force or the legal effect of the evidence as it is adduced and shown by the record, though such findings may be a guide in determining the credibility of witnesses and in reconciling conflicts in the testimony. The findings of a Chancellor upon the evidence will not be disturbed on appeal when the findings are supported by adequate legal evidence and are not clearly wrong on the whole evidence, and applicable rules of law and procedure were duly observed in making the findings. See Johns v. Bowden, 72 Fla. 530, 73 South. Rep. 603.

A mere doubt as to whether a finding is justified by the evidence will not authorize the Appellate Court to set aside the finding. Taylor v. Kelly, 103 Cal. 178, 37 Pac. Rep 216.

In case a doubt is raised by a decided conflict in the testimony, and there is no outstanding feature of the case resolving the doubt in favor of either party, an Appellate Court will not disturb the finding of the Chancellor. Craft v. American Agr. Chemical Co., 81 Fla. 55, 87 South. Rep. 41.

A finding by a Chancellor on conflicting evidence will not

be disturbed by the Appellate Court, where the mind can not repose with entire confidence and certainty on a conclusion in favor of either party. Baggett v. Otis, 65 Fla. 447, 62 South. Rep. 362; Travis v. Travis, 81 Fla. 309, 87 South. Rep. 762; Slorah v. Wilcox, 59 Fla. 601, 52 South. Rep. 12.

The evidence is legally sufficient to support a finding that Quinn, a real estate broker, having requested McDonald to secure a cash offer for property listed with Quinn for sale, received through McDonald a cash offer of $50,-000.00 from Phipps with a request that Quinn communicate the offer to the owner of the land; and that Quinn by his conversation and conduct led McDonald to believe that he (Quinn) as a real estate broker would present the offer of Phipps to the owner of the land. McDonald's testimony as to Quinn's undertaking to present the offer of Phipps should be considered in the light of Quinn's request for an offer. The course of dealing by implication of law created a fiduciary relation between Quinn as a real estate broker and Phipps, an intended purchaser of land listed for sale with the broker; and such fiduciary relation to Phipps was not inconsistent with Quinn's relation and duty to the owner of the land. In view of Quinn's conduct Phipps did not make other arrangements for presenting his offer to the owner. Quinn did not present the offer of Phipps to the owner, who would have considered it, and did not decline to do so, and the evidence justifies a finding that Quinn did not advise Phipps or his agent that Quinn intended to purchase the property for himself. Quinn contracted to purchase the property for himself for $45,000.00, part cash. The conduct of Quinn in calling at Phipps' office in New York on his return from Boston as Quinn said he would do when he asked for the address of Phipps' New York office, the statements made by Quinn in New

York to Phipps' agent, Hayman, and other conduct of Quinn were calculated to make Phipps' agents believe that Quinn had presented Phipps' offer to the owner, when instead of doing so Quinn contracted to buy the property for himself. See Kochorinbus v. Maggos, — Ill. —, 154 N. E. 235.

Quinn being a real estate broker, with land listed with him for sale, by his words, acts and course of conduct following a request for an offer and the receipt of an offer from Phipps for the land, assumed a fiduciary relation of agency for Phipps that was not inconsistent with Quinn's duty to the owner of the land, and equity will not permit Qninn to profit by a violation of the duties imposed upon him by law in consequence of such fiduciary relation to Phipps. See Harrison v. Craven, 188 Mo. 590, 87 S. W. Rep. 962; Harrop v. Cole, 85 N. J. Eq. 32, Atl. Rep. 378. It is not necessary or appropriate to discuss the rules that would be applicable to the transaction if Quinn had not been a real estate broker upon whom the law casts fiduciary duties by reason of the occupation. In Amber Petroleum Co. v. Breech, (Tex. Civ. App.) 111 S. W. Rep. 668, the alleged agent does not appear to have been a real estate broker, and it was held that an agency was not shown. In Parramore v. Hampton, 55 Fla. 672, 45 South. Rep. 992, the defendant was not a real estate broker and no fiduciary relation between the parties was shown. See also Nash v. Jones, 41 W. Va. 769, 24 S. E. Rep. 592; Allen v. Richard, 83 Mo. 55; Hackney v. Butts, 41 Ark. 393; Mitchell v. Wright, 155 Ala. 458, 96 South. Rep. 473. In Lazarus v. Sands, 27 N. Y. S. 885, 7 Misc. Rep. 282, it was held that the defendant was not employed by the plaintiff. In Taylor v. Kelly 103 Cal. 178, 37 Pac. Rep. 216, there was no trust relation and the plaintiff was in default.

The business communications between Quinn and the

owner of the land contemplated that offers for the property from prospective purchasers could be received and communicated by Quinn to the owner and that commissions to
Quinn as a real estate broker for a sale of the land would
be paid by the owner.  The undertaking of Quinn to present to the owner the offer made by Phipps is implied from
his course of conduct, if not otherwise shown, and the fiduciary duty of Quinn as a real estate broker to present
the offer did not depend upon a consideration moving from
Phipps to Quinn, or upon the use by Quinn of the resources
of Phipps in making a purchase of the land, or upon
whether the offer of Phipps was binding on him, the question being not as to a contract to purchase the land, but
as to the assumption by Quinn, a real estate broker, of a
fiduciary relation to Phipps which in law was not inconsistent with Quinn's fiduciary duty to the owner, and which
in law imposed a duty on the broker to present the offer
made to him at his solicitation by Phipps through McDonald.  In Madden v. Cheshire Providant Inst., 77 Kan. 415,
94 Pac Rep. 793, the agent, in the discharge of his duty to
the owner, presented to the owner a higher bid made by
another which was accepted.

The refusal of Quinn to communicate the offer of Phipps
to the owner by long distance telephone as requested by
Phipps through McDonald, was apparently for the benefit
of Phipps and not adverse to the interests of the owner,
since Quinn stated in connection with the request that he
preferred to visit the owner in person and would on his
return stop in New York and advise the agent of Phipps of
the result of his visit which his conduct implied would be to
present the offer of Phipps, he having asked McDonald for
Phipps' New York office address, and had apparently
agreed to comply with the request to present the offer of
Phipps.  See 1 Mechem on Agency (2nd ed.) 253.

As Quinn's communications with the owner indicated

that Quinn's commissions for a sale of the land would be paid by the owner, and as Quinn stated he was going to Philadelphia on another mission and would go on to Boston to see the owner, the mere refusal of Quinn to accept an offer of expense money for the trip to Boston from the agent of Phipps was not notice to Phipps that Quinn would not present the offer of Phipps to the owner or that Quinn would endeavor to purchase the land for himself. The request for and the acceptance by Quinn of an offer from Phipps for lands that had been listed for sale with Quinn, a real estate broker, made it proper, independent of the express understanding, that Quinn should be compensated by the owner of the land if he was the procuring cause of a sale of the land for the owner.

The relation of Quinn, a real estate broker, to the owner of land listed with him for sale, required of Quinn absolute fidelity to the owner's interests; but the listing of the land with Quinn as a real estate broker contemplated the receipt of offers for the land by Quinn to be communicated to the owner. The licensed occupation of real estate broker by implication of law cast upon Quinn a fiduciary duty to faithfully present offers for the land made to him as a broker when such offers are not inconsistent with the interests of the owner; and the law forbids the broker to profit by a breach of his fiduciary duty to either the owner who had listed lands for sale or the one making an offer for the listed land through the licensed broker. A real estate broker can and should be faithful to the owner of lands listed with the broker for sale in accepting and transmitting to the owner proper offers for the land, and should be faithful to those making offers to purchase the land, by communicating the offers to the owner and by not acting for himself to the detriment of those whose offers he has received and undertaken to communicate to the owner.

In this case Quinn was a real estate broker; and by ask-

ing for and receiving an offer for lands listed by the owner with Quinn for sale, and by his conduct in the premises, Quinn, by implication of law, accepted a request to communicate the offer to the owner, and thereby as such broker assumed a fiduciary relation to Phipps that was entirely consistent with and was contemplated by the relation between Quinn as a broker, and the owner of the land; and a breach by Quinn of his fiduciary duty to Phipps by failing to present the offer of Phipps, which offer would have been considered by the owner, and by buying the land for himself at a price not in excess of the offer of Phipps without notifying Phipps of his intention to buy for himself so Phipps could make other arrangements to have his offer presented in time for due consideration by the owner, renders Quinn liable for such breach of fiduciary duty to Phipps, the injury to be redressed as may be provided by law. And the injured party, whether it be the owner of the land or the person whose offer was not presented, is not confined to an action at law for damages, but may proceed in equity to have constructive trust in the property decreed upon appropriate procedure under the law of the forum. A breach by Quinn of his fiduciary duty to the owner and the failure of the owner to seek redress does not prevent Phipps from obtaining appropriate redress for the injury resulting in a breach of Quinn's fiduciary duty to Phipps, when Quinn's duty to Phipps was not in any way detrimental to the owner or inconsistent with Quinn's duty to the owner. And it is quite immaterial that Quinn received no compensation from Phipps, since the liability is for a breach by Quinn a real estate broker of a duty imposed by law upon the acceptance or assumption by Quinn of a fiduciary relation to Phipps with reference to the purchase of the lands from the owner thereof, the fiduciary relation and duty of Quinn towards Phipps, a prospective purchaser, being not repugnant to, but consist-

ent with Quinn's fiduciary relation and duty to the owner of the land listed for sale with Quinn, a real estate broker.

TERRELL, J., concurs.