WHITE, JOSEPH S., Associate Judge.
This appeal requires review of proceedings in the county judge’s court to revoke probate of a will. A petition to revoke probate was filed by a niece of testatrix. The neice, who had not seen her aunt in several years, had been named beneficiary in a will executed during the year 1952. She was left nothing by the will now in question. Instead the bulk of the estate, appraised at $59,000, was left to J. Hillis Miller Teaching Hospital at the University of Florida, where the testatrix was con *808 fined as a patient at the time of execution of the later will.
Testimony was taken regarding the circumstances surrounding execution of the will and the county judge denied the petition. The niece has taken this appeal, contending that undue influence to which the testatrix was subjected rendered probate of the will improper.
The testatrix, Margaret Elizabeth Gay, a widow and a retired registered nurse, was sixty-one years of age, without child or other lineal descendants. She entered the hospital January 20, 1961, for diagnosis and treatment of an aneurysm, with bleeding, near the base of the brain. An operation was recommended. The will was executed January 26, 1961, and the operation followed the next day. Mrs. Gay died February 3, 1961, while yet a patient in the hospital.
Florida Statute § 731.19, F.S.A., rendering voidable charitable devises and bequests made under certain conditions, is not applicable here.
In support of the appeal appellant disputes the sufficiency of the evidence to support the county judge’s decision that execution of the will was free from undue influence. This court may reverse only if there is an absence of substantial evidence to support the decision or if the trial judge has misapprehended the legal effect of the evidence as a whole. In re Estate of Walker, Fla.App.1966, 188 So.2d 352.
The record indicates that execution of the will now in dispute was first mentioned by Mrs. Gay on the occasion of a visit by a close friend, Mrs. Hostetter, who was then residing in Gainesville. Mrs. Hostetter testified that she had on several occasions visited Mrs. Gay since her arrival at the hospital in Gainesville and that on the second visit and frequently thereafter Mrs. Gay told her that “she wanted to make her will.” According to Mrs. Hostetter, Mrs. Gay said “that she wanted the University of Florida to have it, and I told her she had her will made, hadn’t she, and she said, yes, that they had plenty and didn’t need it, and she wanted the University of Florida to have it to use it for research so that it would help others.” She requested Mrs. Hostetter to “call an attorney” to prepare the will. Mrs. Hostetter testified that she “tried to put her off” and “would put her off from time to time.”
Finally Mrs. Hostetter went to the hospital office. There she was told “that is out of our power, we can have nothing to do with that at all as we would be the receivers and we don’t want anything to do with it, and we can’t.”
Mrs. Hostetter went a second time when she “saw another man” and was told the same thing.
L. R. Jordan, director of the hospital, visited Mrs. Gay and described his visit as follows:
“When I arrived at work Monday morning I had a note from the nurses’ division that a patient on the, as I remember, it was the fourth floor, anyway, where Mrs. Gay was, wanted to change her will and leave her estate to the University of Florida Hospital. This was all the note said, this was turned over to nursing by the people that were on during the weekend when this came up. Later in the morning I received a call from my unit manager, we have an administrative manager on each floor, asking that I come up to talk to Mrs. Gay. Monday is the busiest day that I have in the office because I am usually not in the office on Saturday afternoons or Sundays, and have the correspondence to check over and all of the admissions to look over and problems of these people that have gone off shifts, so I didn’t get up to see Mrs. Gay until late in the afternoon. Before I got up I was paid a visit by Mrs. Hostetter who was a friend of Mrs. Gay’s, who gave me essentially the same message that I had received from the nursing personnel *809 as well as from the administrative personnel.
“Q. Did you talk to Mrs. Gay on that Monday ?
“A. I went up to her room, the exact time I don’t remember, I do remember it was kind of late in the afternoon, I had a fairly rough day in the office, went on the floor and checked by the nursing station to find out if her physician or any of the members of the staff that were looking after her happened to be there, and the resident physician in charge of Mrs. Gay’s care was there and I asked him if it would be all right if I went in to talk to her at this time, were there any problems, and he said that there were none whatsoever to go right on in.
“Q. Did you talk to her at that time?
“A. Yes, I went in and introduced myself first, to identify who I was, and we had a lengthy conversation, I would say in excess of thirty minutes, somewhere between thirty and forty-five minutes. We talked about generalities at first, she I am sure, when I went in and introduced myself and I said, ‘I understand you want to see me, that you have been asking to see me,’ and she said, ‘Yes.’ I said, ‘First of all, let’s find out how they are treating you,’ because anytime that I am talking with patients I like to know whether the people on the floor are doing their job and what kind of condition exists and check up on what kind of work they are doing. She brought out very quickly that she was a registered nurse, and she talked to me about our nursing students, they wear pale blue uniforms, and the graduate nurses wear white uniforms, she commented on the beautiful blue uniforms and how attractive and intelligent the nursing students were. All of our nursing students are regular college students and do receive a degree. We discussed this, she commented on the doctors that were looking after her and how well she had been treated. She talked about West Virginia, she told me she had come to Melbourne from Charleston, West Virginia, she told me, the only family she mentioned, she mentioned a sister and her husband that lived in West Virginia, and she mentioned a niece, she had a niece in south Florida, Fort Laud-erdale, as I remember, and we got into conversation, we talked for such a long time because this was the first visit that I had with her.
“Q. During your conversation with her did you all discuss the will ?
“A. We did, this was the last thing that we discussed. As I remember, I didn’t bring the subject up, she brought the subj ect up, she knew why I was there, she had asked for me, and I knew why I was there, so I figured that if the subject was brought up she would bring it up. She told me that her sister, as I remember the words ‘well fixed’ in Charleston, and said that her niece would receive this money that her sister had, the estate of her sister, and that her money, what little she had left, whatever was in her estate after she passed away, she would like to leave to some worthy cause, and she would like to leave it to the University Hospital. Of course, I thanked her, this was a compliment, and told her that we certainly did appreciate it, but I told her that it was our policy not to get involved in personal estate matters of the patients. I said we were quite concerned about this and would certainly not urge you to do so and urge you to really think about it because I didn’t know whether there was some very minor unhappiness or petty problem—
“Q. Did you inquire of Mrs. Gay as to her sister or niece, as to whether they were having any difficulty?
“A. No, I didn’t because I assumed that they were not. She never spoke with any bitterness or hostility, her speaking of the sister and of the niece was warm and friendly, there was no reason for me to think that there was, yet she did want to *810 change her will and she mentioned that her previous will left everything to her niece, and she explained to me that she really didn’t think the niece would need it, and that she would like for it to he left to a worthy cause. She persisted in this, and I told her, I said, ‘Mrs. Gay, I just don’t want to have anything to do with the changing of your will, you are going to get well, you are going home, and you can change it after you go home.’ She said, ‘No, I want to change it before my operation.’ As a last resort I said, ‘Will it be all right if I call a minister and have you talk it over with him.’
“Q. Did Mrs. Gay request that you call a lawyer?
“A. She did.
“Q. Did Mrs. Gay consent to your calling a minister?
“A. Yes, I suggested that she talk it over with a minister because she was sick and I wanted to do everything I could to help her, as I would any patient, but you just don’t get involved with patients changing their estate if they are going to leave it to the hospital or the University particularly because it is just an ethical matter that you just don’t get involved in this kind of thing. I thought there might be some slight unhappiness or disappointment or something that might be temporary, so if she talked it over with a minister, or counsel, he may be able to bring this out, I didn’t feel like it was up to me to go into the personal family relationship.”
A clergyman having no connection with the hospital was summoned. He testified before the county judge that Mrs. Gay wanted some legal counsel. The clergyman explained to her that it was not his custom to select or to make contact with lawyers but that he would give her the names of several firms “whom I considered to be reputable firms.” He stated that Mrs. Gay “had mentioned Mr. Fagan,” and wanted to know if he “would be one whom I would recommend, which I did.”
It is not clear from the record where Mrs. Gay first obtained Mr. Fagan’s name, but there is no indication that he had any connection with the hospital.
On a later visit Mrs. Gay complained to the clergyman about the delay in affording her legal counsel. She was concerned “that they did not seem to want to get, to give her any help in getting the will changed.” At that time the clergyman visited “Mr Jordan’s office and as I recall, he wasn’t there, and it was then that I talked with his assistant, simply to say to him that Mrs. Gay had spoken with me about the apparent lack of interest. I tried to explain to her that this wasn’t something that could be pushed by a university, it wasn’t something which I wished to push. And it was then that she said, ‘Well, if the University didn’t want it, then she couldn’t do any thing else about it’ ”.
Following this message from the clergyman Mr. Houtz, an assistant director of the hospital, telephoned Mr. Fagan’s home but was unable to reach him. He was referred, instead, to Mr. Crouch, Mr. Fagan’s law partner. Mr. Houtz met Mr. Crouch, a member of the Gainesville Bar, at the hospital door shortly after nine o’clock that evening and introduced him to Mrs. Gay. Mr. Houtz departed, leaving the attorney alone with Mrs. Gay. The attorney was careful to question her about her kin and nature of her possessions. She repeated her desire “to leave what I have here, what I have, to the University, to this hospital.”
Mr. Crouch testified: “After I had talked to her, I will say five to seven, five to ten minutes, I said, ‘Now, Mrs. Gay, do you want to make your last will and testament ?’ And I had come to the conclusion she was perfectly able to do so. I said, ‘Now who do you want to leave your property to?’
“And she stated that she wanted her bills paid, if she had any; and whatever was left, she wanted left to the University— *811 correction — she said, ‘Whatever I have left, I want it left to this hospital.’
“I said, ‘Mrs. Gay, do you desire to leave anything to your niece or to your sister?’ And I said, ‘Mrs. Gay, you have told me this hospital has given you good service, and that they will keep on giving you good service, and they don’t expect you to leave them this money, and they won’t be worried, I am sure, if you don’t.’
“I said, ‘Do you want to leave anything to your niece or to your sister?’ And she said, ‘No, I do not. This is a wonderful place; that is where I want my property to go.’”
Appellant argues that because of the relationship between Mrs. Gay, a patient, and the hospital undue influence should be presumed.
It is a well recognized rule that where a beneficiary, who occupies a confidential relationship with the testator, is active in procuring the execution of a will,a presumption of undue influence arises. In re MacPhee’s Estate, Fla.App.1966, 187 So.2d 679. But, cf. In re Peters’ Estate, 155 Fla. 453, 20 So.2d 487, and In re Joiner’s Estate, Fla.1963, 156 So.2d 161.
A confidential relation exists between parties where there is a relation of trust and confidence between them; that is where confidence is reposed by one party and a trust accepted by the other. Quinn v. Phipps, 1927, 93 Fla. 805, 113 So. 419, 54 A.L.R. 1173.
The record indicates a scrupulous and punctilious effort on the part of the hospital officials to keep at “arms length” in regard to the patient’s wish to philanthro-pize the hospital. They were careful to avoid the role of confidant. Such was their bounden duty, under the circumstances. This does not mean, however, that desires of a patient in such matters be completely ignored. In such a case the patient should be urged to choose his own attorney, and where he is unable to do so, the hospital should refer him to competent counsel, dis-attached from hospital affairs. Otherwise, a patient wishing to make testamentary disposition of his possessions, but lying helpless in a hospital, may be deprived of a legal right to do so.
Under the circumstances in this case there was no presumption of undue influence and none shown by the record. Accordingly, we affirm the lower court.
Affirmed.
ANDREWS and CROSS, JJ., concur.